# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

Julie A. Su,[1]

      Plaintiff

v.

NAB, LLC, Asia Trinh, and Nicole Brown,

      Defendants

Case No.: 2:21-cv-00984-JAD-EJY

**Order Resolving Summary Judgment Motions, Ordering Supplemental Briefing, and Denying All Remaining Motions**

[ECF Nos. 97, 98, 108, 136, 143, 144]

Julie A. Su, the Acting Secretary of Labor of the United States Department of Labor, sues NAB, LLC d/b/a NAB Nail Salon d/b/a NAB Nail Bar, its owner Asia Trinh, and its manager Nicole Brown for violating the Fair Labor Standards Act's minimum-wage, overtime,[2] recordkeeping, and anti-retaliation provisions. The Secretary moves for summary judgment against all defendants, contending that there is no dispute that NAB's nail and eyelash technicians are properly classified as employees and that the defendants didn't comply with the Act's requirements for those employees, willfully evaded those requirements, failed to keep records of the employees' hours, and retaliated against techs who cooperated in the Department's investigation. It also contends that the defendants violated the Act's wage-and-hour provisions with respect to NAB's salaried salon assistant and hourly front-desk employees.

After a series of hired lawyers withdrew, default was entered against NAB for failing to obtain new representation. Brown and Trinh are now representing themselves. Brown filed several oppositions to the Secretary's summary-judgment motion, as well as her own motions to dismiss and for summary judgment. Trinh also filed a response, which the Secretary moves to

---

[1] The Clerk of Court is directed to update the docket's caption to reflect that Julie A. Su, the current Acting Secretary of Labor, is the proper plaintiff in this case. Fed. R. Civ. P. 25(d).

[2] I occasionally refer to the Secretary's minimum-wage and overtime claims collectively as "wage-and-hour" claims throughout this order.

strike as untimely.  Brown separately objects to the magistrate judge's order granting Department of Labor attorney Paige Pulley's motion to withdraw from this case and seeks sanctions against the Secretary for Pulley's alleged "serious misconduct."

The net result of these myriad motions is the near-end of this case and one final opportunity for briefing on narrow damages issues.  The Secretary's wage-and-hour claims result in a split judgment.  I grant summary judgment in her favor for 2018, 2019, and 2021.  But the record fails to establish that NAB or its employees qualified for the Act's coverage in 2020 or 2022, so I grant summary judgment in favor of the defendants on any wage-and-hour claims for those years.

That determination complicates a final damages calculation on the Secretary's wage-and-hour claims because the Secretary seeks damages for several NAB employees whose employment spanned both covered and non-covered time periods.  The Secretary has shown that four employees who did not work at NAB in 2020 or 2022 incurred damages because of NAB's wage-and-hour violations, so it is undisputed that those employees are entitled to backpay.  But for the rest, I deny the Secretary's motion as to the ultimate question of damages without prejudice to her filing a renewed motion setting forth the damages owed from violations that occurred between May 21, 2018, through December 31, 2019, and January 1, 2021, through December 31, 2021.  I reserve my ultimate ruling on remedies until that motion is fully briefed.

I grant the Secretary's motion for summary judgment on her retaliation claim because she has shown without genuine dispute that Brown and Trinh engaged in retaliation when they directed NAB's employees to provide untrue information to Department investigators, forced them to sign independent-contractor agreements and obtain business licenses that altered the terms of their employment, and threatened legal action against a tech who spoke with

investigators. I also find that the Secretary is entitled to judgment on her recordkeeping claim because NAB failed to keep adequate records of its employees' hours. But I deny the remaining portions of Brown's motions for summary judgment and to dismiss, overrule Brown's objections to Pulley's withdrawal, and deny Brown's request for sanctions. And although I deny the Secretary's motion to strike Trinh's summary-judgment response because I deem it timely filed, I sua sponte strike the additional responses that Brown filed without first seeking leave to do so.[3]

**Preliminary Procedural Matters**

**A.    The court accepts Trinh's late summary-judgment response but strikes Brown's second, untimely response.**

*1.    Trinh's August 30, 2024, response is deemed timely.*

Brown and Trinh have filed several versions of a response to the Secretary's motion for summary judgment. Brown initially filed three responses on behalf of Trinh, NAB, and herself.[4] I struck those responses, reminded Brown that she may not file documents on behalf of other parties, advised her on the requirements for a summary-judgment opposition, and extended her deadline to August 22, 2024, to file another opposition that complies with those requirements.[5] Brown filed a response by that extended deadline,[6] but Trinh filed a separate response that was docketed on August 30, 2024.[7]

---

[3] The Secretary titles her response to Brown's sanctions motion as an "opposition to and motion to strike defendant Brown's motion for sanctions." ECF No. 146 at 1 (cleaned up). But the Secretary didn't file a separate motion to strike as Local Rule IC 2-2(b) requires. So I treat that document only as an opposition, not as a separate motion.

[4] ECF Nos. 116, 121, 130.

[5] ECF No. 131.

[6] ECF No. 133.

[7] ECF No. 135.

The Secretary moves to strike Trinh's response, arguing that Brown was the only party granted an extension to file a new response, so Trinh's opposition is about three months late.[8] And, the Secretary reasons, even if I retroactively applied Brown's extended deadline to Trinh, her response was still eight days late.[9]  Trinh responds that she sent her opposition to the Clerk of Court just after midnight, Eastern Standard Time, on August 23, 2024, but it was rejected because her notary's electronic signature sealed the document.[10]  She asks not to be penalized for an administrative delay that she had no control over.[11]

I retroactively apply to Trinh the deadline extension I afforded to Brown.  In my prior order striking many of Brown's filings, I informed her that she may not file documents on behalf of other parties.[12]  Though Brown and Trinh were warned about this with respect to representing NAB, I acknowledge that they may not have understood the strict rules governing Brown's inability to assist Trinh in filing responses in this action until my August 1, 2024, order, which advised Brown and Trinh that they needed to file their own, separate responses.[13]  And I find that Trinh constructively filed her opposition by August 22, 2024, and served it on counsel by that date, though it was not docketed due to a document error.  So I find good cause to retroactively grant Trinh an extension, I deny the Secretary's motion to strike, and I deem Trinh's response as timely filed.

---

[8] ECF No. 136.

[9] *Id.*

[10] ECF No. 138.

[11] *Id.*

[12] ECF No. 131.

[13] *Id.*

### 2. *Brown's September 10, 2024, surreply is stricken and not considered.*

On September 10, 2024, Brown filed a "response to plaintiff's motion to strike [Trinh's summary-judgment opposition] and reply to plaintiff's motion for summary judgment."[14]  To the extent Brown argues against striking Trinh's response, I do not consider those arguments because she may not present arguments on another party's behalf and that issue has been mooted by my decision to consider Trinh's opposition.  The remainder of Brown's "reply" to the Secretary's summary-judgment motion appears to be an unauthorized surreply.  "Surreplies are not permitted without leave of court" and "motions to file a surreply are discouraged."[15]  Brown did not first seek leave to file this document and I do not find good cause to allow her to do so, so I strike it and do not consider it.

### B. Brown and Trinh's evidence violates this court's procedural rules and cannot be relied upon by this court.

Brown has peppered the docket with several unauthorized filings and has failed to follow the rules of this court in submitting evidence to support her summary-judgment motion and oppose the Secretary's.  The exhibits attached to her response clock in at more than 2,500 pages.[16]  She does not explain what those exhibits contain or how they show any disputed facts or facts that should be weighed in her favor.  Instead, her response is littered with bald references to exhibits with no explanation about their relevance to the discrete legal issues to be decided at this stage in the proceedings.  Many of the exhibits she attaches are interwoven with legal arguments that should have been included in her response brief.  And even if her exhibits were

---

[14] ECF Nos. 139, 140.  These documents are identical.

[15] Local Rule 7-2(b) (cleaned up).

[16] *See* ECF Nos. 133-1–133-32.  Brown also filed a supplement to her response containing another 111 pages of exhibits.  ECF Nos. 134, 134–1.

correctly referenced in her filings, there's no indication that any of them are authentic, able to be authenticated, or contain information that could be presented in an admissible form at trial.[17]

As the Ninth Circuit has noted when addressing similar briefing messes, "judges are not pigs, hunting for truffles buried in briefs."[18]  Brown has been advised of the rules governing documents filed with this court and has been sanctioned with the striking of documents she's filed in the past.[19]  She has not learned from those admonitions.  Pro se litigants like Brown must follow the procedural rules of this court and must endure the consequences of failing to do so.[20]

Even if I were to excuse the technical aspects of Brown's noncompliance, her filings are impossible to comprehend.  Her motion baldly asserts legal conclusions without supporting them with any authenticated or likely-to-be admissible evidence.  So I do not consider her evidence when ruling on the cross-motions for summary judgment.  Because Brown is a defendant in this action, this is not necessarily fatal to her motion for summary judgment or her opposition to the Secretary's motion.  But I do limit my consideration of evidence to that submitted by the Secretary with her motion, any legal arguments that Brown made within the bounds of her briefs, and the declaration that Trinh attached to her response brief because it was signed under penalty of perjury and sets forth facts based on Trinh's personal knowledge.[21]

---

[17] *See* Fed. R. Civ. P. 56(c)(2) (permitting objections to evidence that "cannot be presented in a form that would be admissible in evidence"); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532–33 (9th Cir. 2011) (concluding that the Ninth Circuit has "made clear that unauthenticated documents cannot be considered in a motion for summary judgment" (cleaned up)).

[18] *Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (cleaned up).

[19] *See* ECF Nos. 63, 131.

[20] *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987) ("Pro se litigants must follow the same rules of procedure that govern other litigants.").

[21] Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  I disregard the rest of Trinh's exhibits because they are unable to be authenticated; I also disregard the argument

**C.    The court does not consider arguments or evidence excluded by the magistrate judge's sanctions order.**

When the Department of Labor began investigating NAB, it sent the business a cease-and-desist letter identifying NAB as a "potential litigant" and instructing it "not to destroy—or permit to be destroyed—any records relating to the number of hours worked or other documents which the Department is seeking."[22]  The Department simultaneously served a subpoena on NAB seeking "communications between [d]efendants and NAB workers, records related to training, and surveillance footage of the nail salon."[23]  Trinh admitted that she "routinely deleted all non-family text messages on her phone from 2018 to 2022, including those related to the salon," and Brown failed to take reasonable steps to preserve surveillance footage of the salon.[24]  So the Secretary moved for sanctions to cure any prejudice resulting from unavailable evidence.[25]

In December 2023, Magistrate Judge Elayna J. Youchah found that the Department was prejudiced by the defendants' failure to preserve electronic evidence, and she imposed evidentiary sanctions on the defendants, precluding them from "disputing [the Department's] reconstruction of workers' hours that could have been substantiated by the deleted video surveillance" and from "disputing the authenticity of the text messages that they have received from nonparties that include Trinh in the conversation."[26]  Judge Youchah further concluded that the defendants failed to produce responsive documents in their native format and thus prohibited

---

sprinkled throughout Brown's exhibits and bald factual assertions about NAB's working conditions for techs.

[22] ECF No. 75 at 4 (quoting ECF No. 45-9 at 2–3) (cleaned up).

[23] *Id.* at 5 (quoting ECF No. 45-8 at 2).

[24] *Id.* at 5–6 (citing ECF No. 45-12 at 13, 15).

[25] ECF No. 45.

[26] ECF No. 75 at 7 (cleaned up).

1  the defendants from "relying on any evidence not produced in its native form with associated

2  metadata" produced before December 12, 2023.[27]  No defendant objected to that sanctions order.

3  I apply these rulings throughout this order and do not consider any of defendants' arguments

4  regarding the Department's hour reconstructions or the validity of text messages between Trinh

5  and NAB workers.

6

7  **D.    As to NAB, LLC, the Secretary's summary-judgment motion is construed instead as one for default judgment.**

8        The Secretary seeks summary judgment against NAB, Brown, and Trinh.  Because NAB

9  has been defaulted, the proper procedure for the Secretary would be to seek default judgment

10  under Federal Rule of Civil Procedure 55(b).  But because the relief that the Secretary seeks and

11  the evidence she relies on will apply equally to all defendants, I construe her summary-judgment

12  motion against NAB as one for default judgment instead and consider it under the standards

13  governing that remedy.[28]

14                                **Background**

15        Defendant Asia Trinh is the sole owner of NAB, LLC d/b/a NAB Nail Salon d/b/a NAB

16  Nail Bar, a Las Vegas, Nevada, business that provides beauty and nail services.[29]  Trinh's spouse

17  and co-defendant Nicole Brown was tasked with managing the salon, its nail and eyelash

18  technicians, and its front-desk staff.[30]  The front-desk employees were paid hourly and were

19  _____

20  [27] *Id.* at 10.  Magistrate Judge Youchah also ruled that the Department is entitled to a jury instruction "allowing jurors to presume that the video surveillance footage would provide

21  evidence [that] was unfavorable to defendants."  *Id.* at 11.

    [28] *See Eitel v. McCool*, 782 F.3d 1470, 1471–72 (9th Cir. 1986).

22  [29] *See* ECF No. 119-2 at 2:12–19; 4:1–7 (Trinh's deposition); ECF No. 102 at 2 (Brown's motion for summary judgment).  All citations use CM/ECF's pagination.

23  [30] ECF No. 119-3 at 8 (the Secretary's unanswered requests for admission).  The Secretary relies on several requests for admission to support her statement of undisputed facts.  The defendants

responsible for scheduling customer appointments and collecting payments at the end of a

customer's visit.[31]  The nail and eyelash technicians performed manicures, pedicures, and

eyelash and nail-art services to scheduled customers, and were paid a commission from each

service performed.[32]  The salon also employed Aurora Perez as a "salon assistant" who was paid

via salary and was responsible for cleaning the salon, restocking supplies, and running errands.[33]

In 2019, the Department of Labor began investigating NAB for possible violations of the

Fair Labor Standards Act's (FLSA) minimum-wage and overtime requirements.[34]  In May 2021,

the Acting Secretary of Labor filed suit against NAB, Brown, and Trinh, alleging that they, as

employers, violated four provisions of the FLSA:

- Failure to pay the minimum wage in violation of 29 U.S.C. §§ 206 and 215(a)(2) (first

  claim for relief) and failure to pay overtime premiums in violation of §§ 207 and

---

never responded to those requests, so I deem them admitted under Federal Rule of Civil Procedure 36(a)(3) and (b).  *See also* ECF No. 119-2 at 22:3–4 (Trinh's deposition, identifying Brown as the only manager at NAB); ECF No. 118-3 at 3, ¶ 9 (Decl. of Brittany Bennett, front-desk employee in 2020, attesting that she reported to Brown and that Brown "ran the business side of NAB" and "[e]verything [she] did at the front desk ran through" Brown).

[31] *See* ECF No. 118-1 (Decl. of Adriana Harkey, front-desk employee from "sometime in 2018 until around July 2020"); ECF No. 118-3 (Decl. of Brittany Bennett, front-desk employee from February 2020 through May 2020); ECF No. 118-14 (Decl. of Autumn Law, front-desk employee from September 2018 through March 2020).

[32] *See* ECF No. 118-2 (Decl. of Barbara Foster, NAB nail tech from May 2018 through October 2020); ECF No. 118-7 (Decl. of Chrystal Armoogan, NAB nail and eyelash tech from August 2018 through July 2019); ECF No. 118-8 (Decl. of Danica Estes, NAB nail tech from May 2019 through November 2019); ECF No. 118-11 (Decl. of Kimberly Garrison, NAB nail tech from March 2018 through September 2019); ECF No. 118-17 (Decl. of Dora Neri, NAB nail tech from August 2019 through May 2020); ECF No. 118-21 (Decl. of Maily Nguyen, NAB nail tech from May 2019 through May 2020); ECF No. 118-24 (Decl. of Sierra Hudson, NAB eyelash tech from February 2019 through September 2019); ECF No. 118-25 (Decl. of Steven Bao, NAB nail tech from March 2019 through July 2020).

[33] ECF No. 119-2 at 11:9–21; ECF No. 119-9 at 5:5–6 (Brown's deposition in her individual capacity as defendant); ECF No. 118-11 at 4, ¶ 14; ECF No. 119-5 at 11:17–20 (Brown's deposition as NAB's 30(b)(6) witness).

[34] ECF No. 117-1 at 2, ¶ 5.

215(a)(2) (second claim for relief).[35]  The Secretary alleges that the defendants failed to pay minimum-wage and overtime to their nail techs, eyelash techs, front-desk staff, and Perez.  She accuses the defendants of misclassifying NAB's nail and eyelash techs as independent contractors to "shift their costs as employers on to their employees" and avoid complying with the FLSA's wage-and-hour requirements.[36]  She also contends that NAB's hourly and salaried employees often worked over forty hours per week, but were not paid overtime premiums for that work.[37]

- Failure to keep adequate records documenting employee hours and pay in violation of §§ 211(c) and 215(a)(5) (third claim for relief).[38]  The Secretary alleges that the defendants "failed to keep time records that would adequately and accurately show" the hours NAB employees worked each day, the total hours worked each workweek, any deductions from employee wages, or the amount of wages paid.[39]  This messy recordkeeping, the Secretary alleges, impeded "the ability of NAB salon employees, and derivatively the Secretary of Labor, to detect, identify, and have notice of" NAB's wage-and-hour violations.[40]

- Retaliation against NAB's employees in violation of § 215(a)(3) (fourth claim for relief).[41]  The Secretary alleges that, after the Department began its investigation, the defendants retaliated against their employees by (1) "instructing [them] to sign and back-

---

[35] ECF No. 1 at 5–6, ¶¶ 21–24.

[36] *Id.* at 4, ¶ 16.

[37] *Id.* at 6, ¶ 24.

[38] *Id.* at 6–7, ¶¶ 25–27.

[39] *Id.* at 6–7, ¶ 27.

[40] *Id.*

[41] *Id.* at 5–7, ¶¶ 21–31.

date contracts, and falsely inform[ing] them that the Department of Labor would fine NAB salon employees," and (2) sending cease-and-desist letters "ordering NAB salon employees to stop speaking with third parties concerning NAB Nail Bar and advis[ing] the employees that the [d]efendants would be withholding wages due for past services to offset a claim for liquidated damages."[42]

The Secretary seeks a permanent injunction against the defendants to prevent future FLSA violations, backpay and liquidated damages for NAB's underpaid employees, an order requiring the defendants to "issue a curative notice to their employees that rectifies their FLSA violations," and an award of costs that the Secretary incurred by prosecuting this action.[43]

The Secretary moves for summary judgment on all four claims.[44] She contends that there is no genuine dispute that the defendants misclassified NAB's nail and eyelash techs as independent contractors and failed to pay overtime and minimum wage to the techs, as well as NAB's other salaried or hourly employees. She also argues there is no genuine dispute that the defendants failed to keep adequate records and retaliated against employees who cooperated with the Department's investigation. Brown moves to dismiss and cross-moves for summary judgment, contending that she is not an employer for NAB, the Department cannot show that NAB qualifies for FLSA coverage, and NAB's techs are independent contractors.[45] Brown also objects to the magistrate judge's order permitting the withdrawal of the Department's lawyer,

---

[42] *Id*. at 7, ¶ 30.

[43] *Id.* at 8–9.

[44] ECF No. 108. The Secretary's exhibits in support of her motion are docketed at ECF Nos. 117, 118, & 119.

[45] ECF Nos. 97 (summary-judgment motion), 98 (motion to dismiss). Brown filed a corrected version of her motion for summary judgment, docketed at ECF No. 102. I cite to the corrected document throughout this order.

1   Paige Pulley, and separately seeks sanctions against Pulley and the Department for "serious

2   misconduct."[46]

### Discussion

4   **A.    The Secretary is entitled to summary judgment on her minimum-wage and overtime claims for violations occurring in 2018, 2019, and 2021, but the defendants are entitled to judgment for any alleged violations in 2020 and 2022.**

6      *1.    The elements of an FLSA wage-and-hour claim.*

7          The "principal purpose of the FLSA is to 'protect all covered workers from substandard

8   wages and oppressive working hours.'"[47]  "Because the FLSA is a remedial statute, it must be

9   interpreted broadly"[48] and "construed liberally in favor of employees."[49]  For the FLSA's wage-

10  and-hour provisions to apply to a business and its workers, the plaintiff must first show that (1)

11  the workers qualify as "employees" under the Ninth Circuit's economic-realities test and (2) the

12  business entities and individuals sued meet the FLSA's definition of "employers."[50]

13         Because the FLSA's reach is national, the plaintiff must also establish that the defendant

14  business or its employees engaged in interstate commerce.  A plaintiff can meet this burden in

15  one of two ways: she can show that (1) "the employee is engaged in [interstate] commerce

16  (individual coverage)" or (2) "the employer is an enterprise engaged in [interstate] commerce

17

18  _____

    [46] ECF Nos. 143, 144.

19  [47] *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1150 (9th Cir. 2000); *Barrentine v.*

20  *Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)).

    [48] *Rosenfield v. GlobalTranz Enters., Inc.*, 811 F.3d 282, 285 (9th Cir. 2015) (cleaned up).

21  [49] *Cleveland v. City of Los Angeles*, 420 F.3d 981, 988 (9th Cir. 2005) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

22  [50] *See* 29 U.S.C. § 203(d)–(e); *Lambert v. Ackerly*, 180 F.3d 997, 1011–1012 (9th Cir. 1999)

23  (explaining standard to determine whether a defendant qualifies as an "employer" under the FLSA); *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (listing factors to consider when determining whether a person is an "employee" under the FLSA).

(enterprise coverage)."[51]  A plaintiff can establish enterprise coverage if a business's employees handle goods that have traveled in interstate commerce and the business has annual sales "not less than $500,000."[52]  To establish individual coverage, a plaintiff must show that the employees' activities are "actually in or so closely related to the movement of the commerce as to be a part of it."[53]

Once those threshold elements are met, the plaintiff must establish that the defendant employers indeed failed to pay their employees the minimum wage (currently set at $7.25) to prove liability under 29 U.S.C. § 206, and that they failed to pay an overtime premium of least 1.5 times an employee's regular rate for any hours worked beyond 40 hours per week to prove liability under 29 U.S.C. § 207.[54]  The FLSA has a two-year statute of limitations for most cases, so a plaintiff may recover backpay and liquidated damages for any violations that occurred beginning two years before the suit.[55]  But that period stretches to three years of pre-litigation violations if the plaintiff can show that the employer willfully violated the FLSA.[56]

The Secretary moves for summary judgment on her wage-and-hour claims, arguing that there is no genuine dispute that the defendants are employers under the FLSA and that all their workers—including the nail and eyelash techs that Brown labels as independent contractors—are employees entitled to the Act's protections.[57]  She also contends that NAB is an enterprise

---

[51] *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 914 (9th Cir. 2003).

[52] 29 U.S.C. § 203(s)(1)(A)(i)–(ii) (cleaned up); *Donovan v. Scoles*, 652 F.2d 16, 18 (9th Cir. 1981).

[53] *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943).

[54] *See* 29 U.S.C. §§ 206, 207.

[55] 29 U.S.C. § 255(a).

[56] *Id.*

[57] ECF No. 108 at 25–30, 32–33.

engaged in interstate commerce because the business uses products sourced outside of Nevada and generates more than $500,000 in annual sales.[58]  She alternatively argues that NAB's employees are individually covered because they use internet-based apps to track their customer bookings and communicate with other salon employees.[59]  The Secretary attests that the undisputed facts establish several violations of the FLSA's wage-and-hour provisions, occurring from mid-2018 through 2022.  She urges the court to apply the longer three-year statute of limitations to encompass an extra year of NAB's alleged violations, arguing that Brown and Trinh's attempts to meddle with the Department's investigation and force their employees to sign independent-contractor agreements show that their violations were willful.[60]  Brown and Trinh deny that they are employers at NAB; Brown insists that NAB's nail and eyelash techs are independent contractors and disputes that NAB engages in commerce or has ever made more than $500,000 in any year.[61]

### 2.    *The first element for wage-and-hour liability is established because NAB's nail and eyelash techs are employees, not independent contractors.*[62]

To determine whether a person is an "employee" covered by the FLSA's wage-and-hour provisions, the Ninth Circuit instructs courts to consider several factors:

---

[58] *Id.* at 30–31.

[59] *Id.* at 31–32.

[60] *Id.* at 36–37.

[61] ECF Nos. 102, 133, 135.

[62] I focus on the nail and eyelash technicians who were paid via commission in this section because Brown and Trinh do not dispute that Sierra Hudson, Aurora Perez, and the front-desk staff were employees under the FLSA.  They were paid either hourly (the front-desk employees) or via a flat rate (Hudson and Perez), and Brown repeatedly refers to Perez as a "W-2 employee," not an independent contractor.  *See* ECF No. 133 at 24.  I also note that much of Brown's summary-judgment argument concerning the techs' employee status is based on an application of Nevada law.  *See* ECF No. 102 at 5–6.  Because this case is governed solely by federal law, Brown's state-law arguments are not persuasive.

(1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; [and] (6) whether the service rendered is an integral part of the alleged employer's business.[63]

This list is not exhaustive and "[n]either the presence nor the absence of any individual factor is determinative."[64]  Rather, courts must evaluate the "circumstances of the whole activity" and determine whether, "as a matter of economic reality, the individuals 'are dependent upon the business to which they render service."[65]  "Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."[66]  So an employer's labeling of its workers as independent contractors carries no weight.[67]

### a.    NAB controlled the manner in which its nail and eyelash techs performed their work.

The Secretary has met her burden to show that there is no genuine dispute that Trinh and Brown controlled almost every aspect of the work that NAB's techs performed.  Trinh set the salon's operating hours as 9:00 a.m. to 11:00 p.m. Monday through Saturday and 9:00 a.m. to

---

[63] *Sureway Cleaners*, 656 F.2d at 1370 (cleaned up).

[64] *Id.*

[65] *Id.* (first quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), then quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

[66] *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) (citing *Rutherford Food Corp.*, 331 U.S. at 729).

[67] *See* 29 C.F.R. § 795.105(a) ("Labeling employees as 'independent contractors' does not make [FLSA] protections inapplicable.  A determination of whether a worker is an employee or independent contractor under the Act focuses on the economic realities of the worker's relationship" with her employer.).  I do not rely on the Department's regulations to make any determinations in this order.  I cite them only to the extent that they provide helpful insight into the applicable considerations for each factor of the economic-realities test.

1   10:00 p.m. on Sundays, and she personally oversaw the closing of the salon every night.[68]  Techs

2   did not have access to the salon outside of those working hours.[69]  Trinh and Brown hired each

3   tech, making applicants "audition" before extending an offer.[70]  They almost always hired techs

4   who auditioned, but they would assign services based on the skill the techs showed during the

5   audition process.[71]

6        Trinh and Brown also managed the techs' schedules and assigned them to 7–12-hour

7   shifts, during which the techs provided services to customers assigned to them by front-desk

8   staff.[72]  The techs were assigned to shifts based on the salon's needs.[73]  Even if techs did not

9   have any clients scheduled, they could not leave the salon during their shifts.[74]  If they wanted to

10   run errands or if they were going to be late, had to leave early, or wanted time off, they had to get

11   permission from Brown.[75]  Brown denied day-off requests based on staffing needs,[76] threatened

12   to give customers to other techs if the assigned tech was running late,[77] and "punish[ed]" techs

13   who took time off by taking away their dedicated nail stations—which resulted in fewer

---

[68] ECF No. 119-5 at 19:9–12.

[69] ECF No. 118-24 at 3, ¶ 11; ECF No. 118-25 at 4, ¶ 13; ECF No. 119-3 at 11.

[70] ECF No. 118-11 at 4, ¶ 15; ECF No. 118-24 at 2, ¶ 4; ECF No. 118-25 at 2, ¶¶ 6–7.

[71] ECF No. 118-11 at 4, ¶ 15.

[72] ECF No. 118-2 at 2–3, ¶¶ 7–8; ECF No. 118-7 at 3, ¶ 5; ECF No. 118-17 at 2, ¶ 3.  *See also* *Alexander v. FedEx Ground Package Sys. Inc.*, 765 F.3d 981, 993 (9th Cir. 2014) (holding that "regular schedules are consistent with employee status and reflect employer control" (cleaned up)).

[73] ECF No. 118-2 at 2, ¶ 6; ECF No. 118-7 at 2, ¶ 5; ECF No. 118-17 at 2, ¶ 3; ECF No. 118-25 at 2, ¶ 7.

[74] ECF No. 118-1 at 2, ¶ 8; ECF No. 118-7 at 2, ¶ 5; ECF No. 118-8 at 2–3, ¶ 7; ECF No. 118-11 at 2, ¶ 4; ECF No. 118-21 at 2, ¶ 5.

[75] ECF No. 118-2 at 2, ¶ 6; ECF No. 118-7 at 2, ¶ 6; ECF No. 118-11 at 2 & 4, ¶¶ 4, 13; ECF No. 118-21 at 2, ¶ 5; ECF No. 118-25 at 3, ¶ 10.

[76] ECF No. 118-25 at 3, ¶ 12.

[77] ECF No. 118-14 at 2, ¶ 5; ECF No. 118-15 (messages between Brown and techs).

customers for those techs.[78]  At least once, Trinh told a tech who had blocked off her schedule during a two-hour period when she didn't have any appointments scheduled that if she "blocked off [her] schedule again, [she] would have to find another job."[79]  And when there weren't enough techs in the store to meet customer demand, Brown or Trinh would direct the front-desk employees to call off-duty techs and persuade them to come in.[80]  On at least one occasion, Trinh threatened the front-desk staff with pay cuts if they did not get techs to come in when they weren't scheduled.[81]

NAB also required the techs to attend trainings on various services to "make sure [the techs] were doing them the way [Trinh] wanted them done" and to prevent the techs from wasting expensive resources that NAB supplied for those services.[82]  Attendance at these trainings was mandatory: Brown told techs that if they were even two minutes late, they would be required to repeat the entire session.[83]  The techs were also required to pass a test after the training "in order to get [their] check[s] released."[84]

Brown and Trinh further supervised the techs' work through their near-constant presence at the salon and through video surveillance.  Brown monitored the techs using cameras placed

---

[78] ECF No. 118-25 at 3, ¶ 11.

[79] ECF No. 118-21 at 2, ¶ 5.

[80] ECF No. 118-2 at 2, ¶ 7; ECF No. 118-3 at 4, ¶ 11.

[81] ECF No. 118-14 at 2–3, ¶ 7; ECF No. 118-16 at 2 (messages from Trinh, telling front-desk staff to "[c]all techs in when you have clients that need service same day. . . . If you don't we will LOWER your pay DOWN").

[82] ECF No. 118-7 at 3, ¶ 14; ECF No. 118-8 at 4, ¶ 13; ECF No. 118-11 at 3, ¶ 7; ECF No. 118-17 at 4, ¶ 11.

[83] ECF No. 118-12 at 32–34.

[84] *Id.*

1  throughout the salon that Brown could watch from the back room.[85]  Brown and Trinh were

2  always at the salon and would walk the floor often to ensure that clients were being charged the

3  correct price and services were being completed to Trinh's standards.[86]  These facts are without

4  genuine dispute,[87] and they support the inference that NAB exercised a high degree of control

5  over the techs' work.

6
                    **b.    *Profit opportunities for techs were dependent on Trinh's preferences***
7                              ***and NAB's set pricing, rather than their own skills.***

8          The undisputed evidence also shows that the techs had no independent control over their

9  ability to earn a profit, and they had to rely instead on NAB for customers and commissions.

10  Several techs explained that they did not bring their own clients with them to NAB.[88]  Instead,

11  the front desk received appointment requests from customers by phone or through NAB's

12  website and assigned the appointments to techs who were scheduled to be at the salon at that

13  time.[89]  Appointments were managed through the MindBody application, which each tech was

14  required to install on her phone and use to track bookings.[90]  Brown and Trinh often moved those

15

---

16  [85] ECF No. 118-2 at 5, ¶ 17.

17  [86] *Id.* at 4–5, ¶¶ 15, 17; ECF No. 118-3 at 3, ¶ 8; ECF No. 118-11 at 4, ¶ 12.

18  [87] Brown argues that these facts are disputed, but she doesn't properly support that argument.
    She merely argues, without adequate citation to the record, that the techs control their own
    schedules and can leave the salon whenever they don't have clients. *See* ECF No. 102 at 8; ECF
19  No. 133 at 4.  Without supporting evidence to support her arguments, they carry no weight.  And
    Brown and Trinh are deemed to have admitted most of these facts by failing to respond to the
20  Secretary's requests for admission.  *See* ECF No. 119-3 (requests for admission).

21  [88] ECF No. 118-7 at 3, ¶ 10; ECF No. 118-8 at 2, ¶ 5; ECF No. 118-11 at 2, ¶ 5; ECF No. 118-17
    at 3, ¶ 7; ECF No. 118-21 at 2, ¶ 4; ECF No. 118-24 at 2, ¶ 5; ECF No. 118-25 at 2, ¶ 9.

22  [89] ECF No. 118-2 at 3, ¶¶ 9–10; ECF No. 118-3 at 2, ¶ 6; ECF No. 118-8 at 3, ¶¶ 8, 14; ECF No.
    118-11 at 5, ¶ 18; ECF No. 118-17 at 3, ¶ 7; ECF No. 118-24 at 2, ¶ 7; ECF No. 118-25 at 2–4,
23  ¶¶ 9, 18.

[90] *See, e.g.*, ECF No. 118-2 at 3, ¶ 9; ECF No. 118-3 at 2, ¶ 6; ECF No. 118-7 at 3, ¶ 10.

bookings around without seeking input from the techs themselves.[91]  Trinh gave the front-desk staff "strict instructions that some techs were not allowed to do higher-priced services . . . ."[92] As a result, some techs would work 8–10-hour shifts at the salon but ultimately provide services to only a couple of customers during those shifts.[93]  And when walk-in clients would show up shortly before closing, Brown or Trinh would assign a tech to stay, even if it meant that the tech might have to work until 1:00 a.m.[94]

NAB also set the prices for all of the services that the techs provided.[95]  Laminated menus listed each service and its exact price, and techs were not permitted to deviate from those prices.[96]  If a customer requested an unlisted specialty service, Brown or Trinh instructed techs on how much they should charge and would "intervene if they thought [the techs] didn't charge

---

[91] ECF No. 118-1 at 2, ¶¶ 6–7; ECF No. 118-2 at 3–4, ¶¶ 12–14; ECF No. 118-3 at 3–4, ¶ 10; ECF No. 118-8 at 3, ¶ 9 (Estes Decl., averring that Trinh "only permitted [her] to perform certain types of nail services"); ECF No. 118-11 at 2–4, ¶¶ 5, 11 (Garrison Decl., averring that she perceived that Brown and Trinh favored her and would let her take customers asking for more expensive services from other nail techs, noting that Brown and Trinh would often reassign high-price services to other favored techs and gave favored techs stations in the front of the salon); ECF No. 118-17 at 3–4, ¶¶ 9–10; ECF No. 118-25 at 3–4, ¶ 12 (Bao Decl., expressing concern over taking a day off because, "when people upset [Trinh] or [Brown] they would make sure the front-desk staff did not schedule as many walk-in or pre-scheduled customers to the nail technician that they were upset with").

[92] ECF No. 118-1 at 2, ¶ 7; *see also* ECF No. 118-3 at 3–4, ¶ 10.

[93] ECF No. 118-2 at 2, ¶ 7; ECF No. 118-8 at 3 & 5, ¶¶ 7, 20; ECF No. 118-11 at 2, ¶ 4; ECF No. 118-21 at 2, ¶ 5.

[94] ECF No. 118-8 at 2, ¶ 6; ECF No. 118-11 at 2, ¶ 4; ECF No. 118-17 at 3, ¶ 7; ECF No. 118-25 at 3, ¶ 10.

[95] ECF No. 118-2 at 5, ¶ 17; ECF No. 118-3 at 4–5, ¶ 14; ECF No. 118-7 at 2, ¶ 9; ECF No. 118-8 at 3, ¶ 10; ECF No. 118-11 at 2–3, ¶ 6; ECF No. 118-17 at 2, ¶ 5; ECF No. 118-24 at 2, ¶ 6; ECF No. 118-25 at 5, ¶ 22.

[96] ECF No. 118-3 at 4–5, ¶ 14; ECF No. 118-8 at 3, ¶ 10; ECF No. 118-10 (laminated services menu with set pricing); ECF No. 118-17 at 2, ¶ 5.

1    the customer enough for the additional service."[97]  And Brown and Trinh would occasionally

2    offer discounts to customers that techs were required to accept, even though accepting the

3    discount reduced their commissions.[98]

4          NAB also controlled how the techs were paid.  When a tech finished a customer's

5    appointment, the tech would input the service she performed in the MindBody app and send a

6    message to the front-desk receptionist using another app called Crew.[99]  Front-desk personnel

7    would then enter that service and the pre-populated price and take payment.[100]  Techs did not

8    take payment directly from customers.[101]  After the salon closed each evening, the front-desk

9    employee on duty would populate an excel spreadsheet with the total amount the salon had

10   collected per tech.[102]  The spreadsheet would automatically calculate the commission that a tech

11   would receive from each service—60% of the charge, with NAB keeping the remaining 40%—

---

[97] ECF No. 118-2 at 5, ¶ 17; *see also* ECF No. 118-24 at 2, ¶ 6 (Hudson Decl., averring that, before NAB added a particular eyelash service to the menu, she "could not charge customers for that service"); ECF No. 118-25 at 5, ¶ 21 (Bao Decl., explaining that Brown and Trinh instructed nail techs on what to charge for specialty nail-art services).

[98] ECF No. 118-2 at 4–5, ¶ 16; ECF No. 118-7 at 2–3, ¶ 9; ECF No. 118-11 at 3, ¶ 10; ECF No. 118-21 at 3, ¶ 7.

[99] ECF No. 118-17 at 2–3, ¶ 6; ECF No. 118-21 at 3, ¶ 8.

[100] ECF No. 118-2 at 4, ¶ 16; ECF No. 118-3 at 4, ¶ 12; ECF No. 118-8 at 4, ¶ 15; ECF No. 118-11 at 5, ¶ 22; ECF No. 118-14 at 2, ¶ 5; ECF No. 118-17 at 3, ¶ 6; ECF No. 118-21 at 3, ¶ 8; ECF No. 118-24 at 3, ¶ 9; ECF No. 118-25 at 5, ¶¶ 21, 23.

[101] ECF No. 118-3 at 4, ¶ 13; ECF No. 118-8 at 4, ¶ 15; ECF No. 118-11 at 5, ¶ 22; ECF No. 118-17 at 2, ¶ 6; ECF No. 118-21 at 3, ¶ 8; ECF No. 118-24 at 3, ¶ 10; ECF No. 118-25 at 5, ¶ 24.

[102] ECF No. 118-1 at 3, ¶ 9; ECF No. 118-21 at 2–3, ¶ 6.

1  and deduct various fees that NAB charged its techs.[103]  Brown would "verify the amount that a
2  tech was supposed to be paid" before the tech was paid out.[104]

3          Brown and Trinh would also deduct any commissions earned from customers who
4  complained about the service they received.[105]  For those customers, Trinh and Brown wouldn't
5  allow the first tech to salvage her work; they would instead assign a different tech to fix the
6  customer's nails free of charge, then they gave the second tech the full commission from the first
7  tech's work.[106]  And if a tech received too many complaints, Brown or Trinh would "end up
8  firing them after a few weeks or months."[107]  NAB's control over the techs' relationships with
9  their customers strongly supports the notion that NAB's profits—not the techs' profits—guided
10 decision-making at the salon.

11         The fact that a tech's work is based in part on specialized skill may weigh in favor of an
12 independent-contractor label.[108]  But NAB dictated how those skills would be performed.  Trinh
13 provided training on the way that NAB preferred services to be done and unilaterally determined
14 whether a tech had the requisite skill for specific services.[109]  Techs were not permitted to take
15 on work that they believed they were skilled enough to perform if Trinh disagreed with their

16 _____

17 [103] ECF No. 118-17 at 2, ¶ 5; ECF No. 118-21 at 2, ¶ 6; ECF No. 118-24 at 2, ¶ 5; ECF No. 118-25 at 4, ¶ 15.

18 [104] ECF No. 118-1 at 3, ¶ 9; ECF No. 118-3 at 3 ¶ 9 (Bennett Decl., attesting that Brown "handled all the payroll for the nail and eyelash technicians" and the front-desk staff (cleaned
19 up)); ECF No. 118-17 at 2, ¶ 5; ECF No. 118-25 at 4, ¶ 16 (Bao Decl., noting that Brown "was the person who issued all of my paychecks").

20 [105] ECF No. 118-7 at 3, ¶ 13; ECF No. 118-8 at 4, ¶ 16; ECF No. 118-25 at 6, ¶ 25.

21 [106] ECF No. 118-2 at 5, ¶¶ 18–19; ECF No. 118-8 at 4, ¶ 16; ECF No. 118-11 at 3, ¶ 9; ECF No. 118-17 at 4, ¶ 10.

22 [107] ECF No. 118-11 at 4, ¶ 16.

23 [108] *See* 29 C.F.R. § 795.110(b)(6) (noting that lack of specialized skill "indicates employee status").

[109] *See supra*, pp. 17–19.

assessment. The record is devoid of evidence that the techs marketed their skills for specific services in the attempt to draw clients to their station, rather than simply performing the service that a NAB-assigned customer wanted.[110] So this factor also weighs in favor of employee status.

### c.    The techs purchased some permanent tools, but NAB supplied most materials required for their specialized services and heavily invested in advertising the techs' work.

The record also establishes without genuine dispute that, while the techs were required to supply some of their own reusable tools like nail drills, cuticle clippers, and UV gel lights, the salon provided most of the materials like nail polish, polish remover, and eyelash extensions.[111] NAB also provided supplies for special services, like CBD oil for specialty pedicures and sugar scrub, hot stones, and foot and leg masks for deluxe pedicures.[112] Some techs noted that NAB deducted daily cleaning fees and other service fees from their paychecks.[113] Brown also set a charge of about 1% of every service a tech performed to cover a portion of the supplies, but "no one at NAB tracked what supplies" the techs actually used.[114]

NAB provided the salon space and service stations for the nail techs to use and a designated room for eyelash services.[115] The techs were not required to pay "booth rent" to use their nail stations,[116] but those hired after the Department of Labor began its investigation were

---

[110] *See* 29 C.F.R. § 795.110(b)(6) (noting that "[i]t is the worker's use of those specialized skills in connection with business-like initiative that indicates that the worker is an independent contractor").

[111] ECF No. 118-3 at 2, ¶ 7; ECF No. 118-8 at 4, ¶ 12; ECF No. 118-11 at 3, ¶ 8; ECF No. 118-25 at 4, ¶ 14.

[112] ECF No. 118-7 at 3, ¶ 14; ECF No. 118-11 at 3, ¶ 7; ECF No. 118-17 at 4, ¶ 11.

[113] ECF No. 118-2 at 6, ¶ 21; ECF No. 118-8 at 3, ¶ 11; ECF No. 118-11 at 6, ¶ 26; ECF No. 118-17 at 2, ¶ 4; ECF No. 118-21 at 2, ¶ 6; ECF No. 118-25 at 5, ¶ 19.

[114] ECF No. 119-5 at 6:2–7:1; ECF No. 118-25 at 5, ¶ 19.

[115] ECF No. 118-7 at 2, ¶ 8; ECF No. 118-11 at 4, ¶ 11; ECF No. 118-25 at 3, ¶ 11.

[116] ECF No. 118-25 at 5–6, ¶¶ 20, 28.

required to pay a "deposit" of varied amounts.[117]  On balance, this factor favors the techs since the space and many of the tools required to provide services integral to the business were supplied by NAB itself.

The investment factor also weighs in favor of finding an employee relationship.  The techs did not spend any of their own money for advertising.[118]  Rather, Brown and Trinh spent substantial amounts of money advertising the salon and the techs' services.[119]  Trinh and Brown also expended significant capital into the business generally, while the techs did not.[120]  Some were required to spend money obtaining business licenses, but Brown and Trinh told them that they would be reimbursed for the cost and some were, though others were not.[121]  Overall, the investments made by NAB far outweigh those made by the techs, both in size and scope.[122]

### d.    NAB maintained long-standing working relationships with its techs and made them sign non-compete agreements.

The Department's regulations counsel that the permanence factor "weighs in favor of the worker being an employee when the work relationship is indefinite in duration, continuous, or

---

[117] ECF No. 118-17 at 2, ¶ 4.

[118] ECF No. 118-2 at 6, ¶ 23; ECF No. 118-11 at 5, ¶ 17; ECF No. 118-17 at 3, ¶ 7; ECF No. 118-21 at 3, ¶ 7; ECF No. 118-24 at 4, ¶ 13; ECF No. 118-25 at 5, ¶ 21.  *See also* 29 C.F.R. § 795.110(b)(1) (noting that relevant facts for evaluating this prong include "whether the worker engages in marketing, advertising, or other efforts to expand their business or secure more work").

[119] ECF No. 118-2 at 6, ¶ 23; ECF No. 118-11 at 5, ¶ 17; ECF No. 118-21 at 3, ¶ 7; ECF No. 118-24 at 4, ¶¶ 12–13; ECF No. 119-3 at 11.

[120] ECF No. 119-2 at 8:7–9:5 (Trinh stating that she took out a $50,000 loan for the business and maxed out all of her credit cards).

[121] ECF No. 118-2 at 6–7, ¶ 25; ECF No. 118-8 at 5, ¶ 18; ECF No. 118-11 at 5, ¶ 20; ECF No. 118-21 at 3, ¶ 10; ECF No. 118-24 at 4, ¶ 14; ECF No. 118-25 at 6, ¶ 29.

[122] *See* 29 C.F.R. § 795.110(b)(2) (noting that "the focus should be on comparing the investments to determine whether the worker is making similar types of investments as the potential employer (even if on a smaller scale) to suggest that the worker is operating independently, which would indicate independent[-]contractor status").

1   exclusive of work for other employers."[123]  The Ninth Circuit has found that a 32-day working

2   relationship did not suggest a permanent working relationship.[124]  At least one district court has

3   weighed this factor in favor of finding independent-contractor status when a worker was only

4   employed for six weeks.[125]

5          The techs who provided declarations worked at NAB for varying amounts of time.  Many

6   techs worked at NAB for about 1–2 years, though some were employed for only a few months.[126]

7   The techs also were not hired on a finite or project-specific basis, as the evidence suggests that

8   techs were hired for an indefinite duration and assigned shifts in a manner indicative of a

9   permanent employment relationship.  Although Brown forced techs to sign an "independent-

10  contractor" agreement in August 2019, the terms of that document had the opposite effect she

11  likely intended because it included non-compete and non-solicitation clauses,[127] evincing the

12  intention for her employees to work exclusively for NAB.  This factor weighs in favor of finding

13  an employee relationship.

14

15  _____

[123] 29 C.F.R. § 795.110(b)(3); *see also Mathis v. Hous. Auth. of Umatilla Cnty.*, 242 F. Supp. 2d
16  777, 785 (D. Or. 2002) (concluding that workers who were employed "for an indefinite duration"
    in which "either party could terminate the relationship at any time" suggested an employee
17  relationship).

[124] *Torres-Lopez v. May*, 111 F.3d 633, 644 (9th Cir. 1997).
18
[125] *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 492 (N.D. Cal. 2017).
19
[126] *See* ECF No. 118-11 at 2, ¶¶ 3–4 (Garrison, nail tech from April 2018 through around
    September 2019); ECF No. 118-2 at 2, ¶ 3 (Foster, nail tech from May 2018 through around
20  October 2020); ECF No. 118-7 at 2, ¶ 3(Armoogan, nail and eyelash tech from August 19, 2018,
    through around July 3, 2019); ECF No. 118-25 at 2, ¶ 3 (Bao, nail tech from March 2019
21  through around July 2020); ECF No. 118-24 at 2, ¶ 3 (Hudson, eyelash tech from February 2019
    through around September 2019); ECF No. 118-8 at 2, ¶ 3 (Estes, nail tech from May 2019
22  through around November 2019); ECF No. 118-21 at 2, ¶ 3 (Nyugen, nail tech from May 2019
    through around May 2020); ECF No. 118-17 at 2, ¶ 3 (Neri, nail tech from August 2019 through
23  around the end of May 2020).

[127] *See* ECF No. 119-12 (independent-contractor agreement).

24

e.    *The services performed by the techs are integral to NAB's business.*

The final factor weighs heavily in favor of an employment relationship because the techs' services are not merely an integral part of NAB's business, their work is the mainstay of the salon's existence.  By failing to answer requests for admission, Brown and Trinh both admit that NAB is, first and foremost, a beauty-services business.[128]  And Trinh affirmed that the primary goal of NAB's business is to provide beauty services, explaining that NAB "specialize[s] in nails, pedicure, lashes, microblading, permanent makeup . . . and eyelash tinting [and] waxing."[129]  That business could not function without nail and eyelash technicians to perform those services.[130]  Brown's late-in-the-game insistence that NAB is merely a booth-rental business is not supported by competent evidence and is negated by the defendants' admissions and Trinh's deposition testimony.  So this factor also weighs in favor of finding that NAB's techs were employees.

On balance, the authenticated, admissible evidence shows no genuine dispute that NAB's nail and eyelash techs were treated as employees, not independent contractors.  Brown's opposition to this conclusion isn't supported by any admissible or relevant facts to the contrary. So I conclude that the Secretary has established without genuine dispute that the FLSA's minimum-wage and overtime provisions cover all of NAB's employees.

---

[128] ECF No. 119-3 at 12.

[129] ECF No. 119-2 at 3:5–4:7.

[130] *See* 29 C.F.R. § 795.110(b)(5) (noting that "[t]his factor weighs in favor of the worker being an employee [if] the work they perform is critical, necessary, or central to the potential employer's principal business").

### 3.   *The second element is met because Brown, Trinh, and NAB are employers under the FLSA.*

In their summary-judgment briefing, Brown and Trinh attempt to convince the court that they should not be considered "employers" of NAB's workers.  Trinh declares that she is "an independent contractor who operates as a nail technician at NAB LLC" and she has "never held any managerial, administrative, or decision-making responsibilities within the company."[131] And Brown states in her summary-judgment motion that she "was a W-2 employee in 2018 and 2019" for the company, not a business owner.[132]  The Secretary disagrees, arguing that regardless of what Brown and Trinh choose to call themselves now, their actions at the salon during the relevant years demonstrate that they are employers subject to FLSA liability in this action.[133]

### a.   *The FLSA defines "employer" broadly.*

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."[134]  "[T]he definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' but is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes."[135]  An individual who "exercises control over the nature and structure of the employment relationship, or economic control over the relationship, . . . is an employer within the meaning of the [FLSA], and is

---

[131] ECF No. 135 at 10.

[132] ECF No. 102 at 2.

[133] ECF No. 108 at 32–33.

[134] 29 U.S.C. § 203(d).

[135] *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999) (cleaned up).

subject to liability."[136]  Courts may look to several factors when determining whether an

individual qualifies as an employer under this broad definition, including whether she has (1) "a

significant ownership interest with operational control of significant aspects of the [business's]

day-to-day functions"; (2) "the power to hire and fire employees"; (3) "the power to determine

salaries;" and (4) the responsibility to maintain employment records."[137]  Individual employers

"are independently liable under the FLSA."[138]

### b.    Brown and Trinh easily meet that broad definition of "employer."

Brown and Trinh's conclusory labelling of themselves as a mere manager and nail tech,

respectively, are belied by all the evidence, which demonstrates that they jointly handled every

aspect of NAB's business.[139]  Trinh testified at her deposition that she is NAB's sole owner who

also works there as a nail tech.[140]  She financed construction of the salon when it opened,[141] set

the salon's hours,[142] had prospective techs audition for her before getting hired,[143] and exercised

---

[136] *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (cleaned up).

[137] *Lambert*, 180 F.3d at 1012.

[138] *Boucher*, 572 F.3d at 1093.

[139] "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting [her] prior deposition testimony."  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  I find that Trinh's declaration disavowing any administrative, managerial, or ownership interest in NAB, LLC is clearly and unambiguously a sham that directly contradicts her deposition testimony, so I disregard it.  *See id.* (requiring courts to make such a factual determination to "trigger the sham[-]affidavit rule" and disregard an affidavit's statements); *see, e.g.*, ECF No. 119-2 at 2:12–19, 5:1–13 (Trinh's deposition, explaining that she owns the salon and describing the vision for NAB that she executed when establishing the business); 6:6-10 (confirming that she was the only lessee on the salon's rental agreement); 8:7–9:5 (describing the capital she expended for NAB's construction); 10:3–12:22 (testifying that she hired Brown to manage the salon and Perez to clean it).  And Brown's assertion that she is merely an employee is not supported by a declaration or any other competent evidence; it carries no weight.

[140] ECF No. 119-2 at 2:12–19.

[141] *Id.* at 8:7–9:5 (Trinh stating that she took out a $50,000 loan for the business and maxed out all of her credit cards).

[142] ECF No. 119-5 at 19:9–12.

significant control over the techs' client assignments.[144]  Brown found the location for the salon and was involved in getting the rental agreement for the building.[145]  She also had the authority to grant or deny the techs' time-off requests,[146] determined and controlled tech pay,[147] hired techs and front-desk staff,[148] and set the various service fees that techs would be charged.[149]  Given all of these uncontested facts, there's no material dispute that Brown and Trinh qualify as employers under the FLSA's broad construction of that term.  So Brown and Trinh may both be held liable for NAB's FLSA violations.  And, applying default-judgment standards to NAB, the Secretary has alleged that NAB is an enterprise and employer under the FLSA.[150]  I consider those allegations true and find that NAB is also an employer under the Act.

### 4.    The Secretary has satisfied the interstate-commerce requirement for FLSA coverage during the years 2018, 2019, and 2021, but not 2020 or 2022.

The FLSA's minimum-wage and overtime provisions apply to an employee "who in any workweek is engaged in commerce or in the production of goods in commerce" (known as individual coverage) "or is employed in an enterprise engaged in commerce or in the production of goods for commerce" (known as enterprise coverage).[151]  The Secretary contends that there is no genuine dispute that NAB and its employees satisfy both the enterprise and individual theories of coverage because NAB is an enterprise engaged in interstate commerce with sales

---

[143] ECF No. 118-11 at 4, ¶ 15; ECF No. 118-24 at 2, ¶ 4; ECF No. 118-25 at 2, ¶¶ 6–7.

[144] *See supra*, Discussion, § A.2(a)–(b).

[145] ECF No. 119-2 at 6:16–20.

[146] *See supra*, Discussion, § A.2(a).

[147] *See supra*, Discussion, § A.2(b).

[148] ECF No. 119-9 at 3:8–16.

[149] *See supra*, Discussion, § A.2(a).

[150] ECF No. 1 at 5, ¶ 19.

[151] 29 U.S.C. §§ 206(a), 207(a); *Chao*, 346 F.3d at 914.

1    exceeding $500,000 per year, and NAB's employees are separately engaged in interstate

2    commerce.[152]

3                    *a.    NAB qualifies for enterprise coverage in 2018, 2019, and 2021.*

4            An enterprise that qualifies its workers for FLSA coverage is defined as one that "has

5    employees engaged in commerce or in the production of goods for commerce, or that has

6    employees handling, selling, or otherwise working on goods or materials that have been moved

7    in or produced for commerce by any person" and "whose annual gross volume of sales made or

8    business done is not less than $500,000 . . . ."[153]  Enterprise coverage applies to "all employees

9    within the stream of commerce of . . . goods [that have traveled in interstate commerce], even if

10   their own participation remains purely intrastate."[154]  Brown contends that neither the interstate-

11   commerce prong nor the $500,000 threshold for enterprise coverage has been met in this case.[155]

12

13                    *i.    NAB's employees handled goods that traveled in interstate
                              commerce.*

14           To satisfy the interstate-commerce prong of enterprise coverage, the Secretary relies on

15   NAB's use of two web-based apps headquartered in California—Crew and MindBody—to

16   communicate with employees, schedule appointments, and take payments.[156]  She also presents

17   evidence that some of the products NAB used were manufactured in Mexico, Germany, and

18

19

20   _____
     [152] ECF No. 108 at 30–32.

21   [153] 29 U.S.C. § 203(s)(1)(A)(i)–(ii) (cleaned up).

     [154] *Scoles*, 652 F.2d at 18–19.

22   [155] ECF No. 102 at 2; ECF No. 133 at 3.

23   [156] ECF No. 108 at 23–24.  Both app companies are incorporated in Delaware.  *See* ECF No.
     119-18 (California Secretary of State corporate statements for Speramus, Inc. (the company that
     owns Crew) and MindBody, Inc.).

California.[157]  Brown contests only the German product, arguing that this evidence is "unverified," "irrelevant[,] and factually incorrect."[158]  She does not deny that NAB uses out-of-state apps to run its business or that some of the other products that NAB used originated outside of Nevada.  The Ninth Circuit has made clear that "a business engaged in purely intrastate activities [cannot] claim exemption from FLSA coverage if the goods its employees handle have moved in interstate commerce."[159]  So even if I credit Brown's unsubstantiated claim that NAB techs didn't use German products, the Secretary has sufficiently shown that all of NAB's employees handled products from Mexico and apps from California, satisfying the Department's obligation to show without genuine dispute that NAB employees handled goods that traveled in interstate commerce.

### ii. NAB earned $500,000 in annual sales in 2018, 2019, and 2021.

To establish enterprise coverage for the FLSA's wage-and-hour provisions, the Secretary must also show that NAB's annual sales amount to "not less than $500,000."[160]  Brown claims that NAB never made annual sales reaching $500,000, so the FLSA does not apply to her business.[161]  She attaches financial records that she says "substantiate this claim, clearly demonstrating that NAB, LLC does not meet the minimum revenue requirement necessary for FLSA applicability."[162]  Those documents are unauthenticated, and I do not consider them for

---

[157] ECF No. 117-1 at ¶ 7.

[158] ECF No. 133 at 3.

[159] *Scoles*, 652 F.2d at 18.

[160] 29 U.S.C. § 203(s)(1)(A)(ii).

[161] ECF No. 102 at 3; ECF No. 133 at 2–3.

[162] ECF No. 133 at 3.

the reasons explained *supra*.[163]  I instead evaluate the documentation that the Secretary has supplied to determine whether the $500,000 threshold has been met.

The Secretary acknowledges that NAB's books were messily kept during this timeframe and relies on a combination of IRS documents, NAB sales reports, and reports from the MindBody app to show that NAB made at least $500,000 during the five years in which she contends NAB was violating the FLSA.  For the years 2018, 2019, and 2021, the Secretary has met that burden.  NAB's reporting from the MindBody app for 2018 shows sales of $903,555.67, and NAB's 2018 payroll journal indicates that $573,475.74 of that total was remitted to techs.[164] NAB's documentation supports that, in 2019, its techs were paid $500,988.04 between January and October, suggesting that NAB's gross sales were much higher than the $500,000 threshold that year.[165]  And in 2021, NAB reported to the IRS that the salon received $571,512.00 in gross receipts and sales.[166]  So because the record shows without genuine dispute that NAB's annual sales exceeded $500,000 in 2018, 2019, and 2021, the Secretary has met her burden to show that NAB was an enterprise covered by the FLSA during those years.

### iii.    The Secretary fails to show that NAB exceeded $500,000 in 2020 or 2022.

The record of NAB's 2020 and 2022 sales reveals a different picture.  The Secretary relies on two documents to argue that the threshold is met for 2020: a 2020 IRS form reflecting $483,653 in gross receipts or sales and NAB's "master tech payout" Excel spreadsheet that,

---

[163] *See supra*, Preliminary Matters, § B.

[164] ECF No. 119-15 (2018 sales report); ECF No. 119-14 (2018 payroll journal).

[165] ECF No. 117-3.

[166] ECF No. 119-13 at 6.

according to the Secretary, shows $191,484 in cash sales within a three-month period.[167]  NAB's

2019 IRS form reflects approximately the same reported amount in gross sales as 2020's, but

other documentation shows that NAB's gross annual sales far exceeded what was reported in

2019.[168]  The Secretary seems to suggest that the same must be true for 2020.  She also suggests

that, extrapolated out in a normal year, it seems likely that a company making almost $200,000

in three months would reach $500,000 in annual sales.

But 2020 was not a normal year.  The COVID-19 pandemic and associated social-

distancing policies disrupted brick-and-mortar businesses to such an extent that it would be

difficult, if not impossible, to guess at a nail salon's average sales during that year.  Brown

suggests (and some of the Secretary's evidence supports a finding that) NAB had to close in

March 2020 because of the pandemic and didn't reopen until "around May 2020."[169]   And the

three-month period that the Secretary relies on spans from January to March 2020, before the

pandemic disrupted businesses like NAB's.  There's no indication in the record that NAB

continued to rake in the same amount in sales after it reopened in May.  Considering these

circumstances and construing the evidence in the light most favorable to the defendants as I

---

[167] *Id.* at 4–5; ECF No. 117-4.  The "master tech payout" spreadsheet is, quite frankly, a total mess.  It's impossible to determine how much NAB earned in sales by reviewing that spreadsheet, and the Secretary doesn't point me to any declaration or authenticated document affirming that her calculation is correct.  But even if I credit the calculation in the Secretary's summary-judgment motion, this three-month showing is insufficient.

[168] *Compare* ECF No. 117-3 (2019 tech payments totaling $500,988.04) *with* ECF No. 119-13 at 2–3 (2019 IRS form reporting $468,995 in gross receipts or sales).

[169] ECF No. 118-25 at 2, ¶ 3; ECF No. 117-1 at ¶ 14 (Decl. of wage-and-hour investigator David Gonzalez, acknowledging that he "did not calculate back wages for the period of time from March 20, 2020[,] to May 13, 2020[,] for the time period the salon was closed due to the COVID-19 pandemic").

1    must,[170] I find that the Secretary hasn't sufficiently demonstrated that the enterprise threshold

2    was met for 2020.  And as for 2022, the Secretary didn't attempt to provide any evidence of

3    NAB's revenue that year, so she didn't meet her burden to show enterprise coverage for 2022

4    either.

5                    **b.    *NAB's employees don't qualify for individual coverage in 2020 or 2022.***

6            The conclusion that NAB doesn't qualify for enterprise coverage in 2020 and 2022

7    doesn't end the court's inquiry.  The FLSA's minimum-wage and overtime provisions also apply

8    to "employees who in any workweek [are] engaged in commerce or the production of goods for

9    commerce."[171]  The test for individual coverage is stricter than that for enterprise coverage.[172]

10   The Supreme Court has explained that the "engaged in commerce" language used to define

11   individual coverage is limited to work that is directly related to commerce, whereas the

12   enterprise-coverage language has a broader reach.[173]  So to evaluate whether an employee

13   qualifies for individual coverage, the court must determine "whether the [employee's] work is so

14   directly and vitally related to the functioning of an instrumentality or facility of commerce as to

---

[170] *See Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (noting that courts "must view the evidence and inferences therefrom in the light most favorable to the party opposing summary judgment").  As I am primarily evaluating the Secretary's motion and evidence, and because the Secretary bears the burden of establishing FLSA coverage, I view the evidence in the light most favorable to the defendants.

[171] 29 U.S.C. §§ 206(a), 207(a).

[172] *See Zorich v. Long Beach Fire & Ambulance Serv. Inc.*, 118 F.3d 682, 684 (9th Cir. 1997) (noting that Congress amended the FLSA in 1961, adding the enterprise-coverage option "to strengthen and extend the scope of the FLSA by extending the benefits of the law to additional employees" (cleaned up)); *Tony & Susan Alamo Found. v. Sec. of Labor*, 471 U.S. 290, 296 n.8 (1985) (concluding that "[e]nterprise coverage substantially broadened the scope of the Act").

[173] *See Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 264 (1959) ("Congress, by excluding from the [FLSA's] coverage employees whose activities merely 'affect commerce,' indicated its intent not to make the scope of the [FLSA's individual coverage] coextensive with its power to regulate commerce."); *McLeod*, 319 U.S. at 493 ("Congress did not intend that the regulation of hours and wages should extend to the furthest reaches of federal authority.").

be, in practical effect, a part of it . . . ."[174]  Courts have held that having employees who merely "handle" goods that have previously been moved between states isn't enough.[175]

Perhaps recognizing that *NAB's use* of web-based apps and products that originated out-of-state is insufficient to establish individual coverage, the Secretary relies solely on *the employees' use* of the apps to demonstrate that they engaged in interstate commerce.[176]  She claims that every tech used the MindBody and Crew apps daily "to book clients, view their schedules, and communicate with NAB staff regarding customer payments."[177]  The Secretary reasons, with no meaningful analysis, that "the internet is an instrumentality of commerce" and that "[a]n employee is covered by the FLSA individually if the employee 'regularly use[s] the

---

[174] *Mitchell v. C.W. Vollmer & Co.*, 349 U.S. 427, 429 (1955); *see also McLeod*, 319 U.S. at 497 (summarizing the test as "not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it").

[175] *See, e.g.*, *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (finding that individual coverage did not apply to worker who used company vehicles—that had been assembled and moved in interstate commerce—to get to and from in-state job cites because the worker never "participated in the actual movement of any object in interstate commerce"); *Llanes v. Zalewski*, 412 F. Supp. 3d 1266, 1270 (D. Or. 2019) (finding that "courts have consistently held that an employee cannot establish individual coverage simply by buying or handling goods locally, even if the goods originated out of state" and collecting cases).

[176] ECF No. 108 at 31–32.  The Secretary doesn't present any evidence validating that either of these apps actually uses the internet to function in the manner that NAB employees use them, or confirming that use of the internet on these apps indeed travels through other states.  Though this may seem a pedantic concern in an age when most tech-savvy people know how the internet works, it's the plaintiff's burden to prove that the interstate-commerce prerequisite to FLSA coverage has been met.  She cannot do so without presenting competent evidence about how using apps that use the internet involves interstate commerce in this instance.  But I don't quibble over this lack of proof because, even if the Secretary had met her burden to show that the apps used the internet in a manner that moved through interstate commerce, she fails to show that the use of those apps results in individual coverage for NAB's employees.

[177] *Id.* at 32.  The Secretary doesn't address whether Aurora Perez qualifies for individual coverage under the FLSA.  Based on the evidence that the Secretary presents, Perez didn't use the MindBody or Crew apps in the same manner or with the same regularity as the techs and front-desk staff.  Because the Secretary fails to show that any of NAB's other employees qualify for individual coverage, I don't separately address Perez beyond this footnote.  The same conclusion—no coverage for 2020 or 2022—applies equally to her.

instrumentalities of interstate commerce in [their] work.'"[178]  This shallow reasoning fails because determining whether NAB's employees engaged in interstate commerce "must be guided by practical considerations, not technical conceptions."[179]

Practically speaking, none of NAB's employees engaged in interstate commerce in a manner that could be described as "vitally related to the functioning of an instrumentality" of commerce.  The work of these employees was quintessentially local.  The Secretary's evidence reflects that NAB's techs used the apps almost exclusively to view their schedules—a passive activity—and communicate with co-workers who were often just feet away from them at the salon—a purely local activity.  The techs didn't even schedule their own appointments through the apps but, even if they had (and as the front-desk workers surely did), the Secretary has presented no evidence to suggest that those communications occurred with individuals outside of Nevada.

The Secretary's suggestion that regular use of an instrumentality of commerce suffices to establish individual liability is undermined by the Department's own regulation that defines and explains who may be considered an employee engaged in commerce.  As relevant here, the regulation states that "workers who regularly use the mails, telephone[,] or telegraph for

---

[178] *Id.* at 31–32.  The Secretary attributes the statement that individual coverage is met if the employee "regularly use[s] the instrumentalities of interstate commerce" to the minimum-wage and overtime provisions in the FLSA, *see id.*, but that phrase is not in either provision.  *See* 29 U.S.C. §§ 206, 207.  Nor is it found in *Zorich*, 118 F.3d 682, the other citation the Secretary offers as support for the statement.  Instead, it appears to come from an Eleventh Circuit case, *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264 (11th Cir. 2006), which in turn is citing 29 C.F.R. § 776.23(d)(2), a Department of Labor regulation governing "employment in the construction industry."  Even if the regulation applied in this nail-salon case (it doesn't), the regulation specifies that employees must use those instrumentalities of commerce "for interstate communication."  As discussed *infra*, the Secretary fails to show that NAB's employees used MindBody or Crew for any interstate communication, so this broader language doesn't apply.

[179] *Mateo v. Auto Rental Co.*, 240 F.2d 831, 833 (9th Cir. 1957) (citing *C.W. Vollmer*, 349 U.S. at 429).

interstate communication" may qualify.[180]  Missing from the Secretary's showing of proof, however, is any "interstate" communication facilitated by the use of these "web-based" apps. Merely showing that an employee uses an instrumentality that is technically capable of interstate communication falls short of showing that the employee regularly used that instrumentality for interstate communication, or that the employee's activities involving the instrumentality are directly and vitally related to interstate commerce.[181]  Because Brown moves for summary judgment on the basis that the Secretary cannot establish FLSA coverage for NAB's business, I grant her and Trinh summary judgment on the Secretary's wage-and-hour claims for 2020 and 2022.  And because the Secretary's failure to show FLSA coverage for those years dooms any wage-and-hour claims against all defendants, I sua sponte grant summary judgment in favor of the defaulted NAB, LLC too.[182]

---

[180] 29 C.F.R. § 779.103.

[181] *See, e.g.*, *Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300, 309 (E.D.N.Y. 2014) (rejecting argument that use of a cellphone alone qualifies an employee for individual coverage, concluding that "the use of a cellular phone . . . but *not* for communication between states, is strictly an intrastate activity, notwithstanding the fact that it utilizes interstate technology"); *Smith v. November Bar N Grill LLC*, 441 F. Supp. 3d 830, 838–39 (D. Ariz. 2020) (rejecting dancer's argument that use of an internet-connected jukebox is insufficient to establish individual coverage, reasoning that "the purely local use of an internet jukebox does not constitute interstate commerce"); *Mays v. Midnite Dreams, Inc.*, 915 N.W.2d 71, 86–88 (Neb. 2018) (concluding that use of internet and phone is insufficient to establish FLSA coverage absent a showing that those channels were used for communication across state lines); *Llanes*, 412 F. Supp. 3d at 1270–71 (finding that an employee who received and delivered mail to and from a community's residents was not individually covered because those are "passive, purely intrastate activities").  The Secretary cites *Miller v. Centerfold Ent. Club, Inc.*, 2017 WL 3425887 (W.D. Ark. Aug. 9, 2017), for the proposition that use of the internet is sufficient to establish individual coverage. *Miller* doesn't discuss the main beef I have with the Secretary's reasoning: that all of the employees' activities, even if they incidentally use the internet, are intrastate in nature.  So I don't find *Miller* persuasive here.

[182] *See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (upholding district court's sua sponte grant of summary judgment to a non-appearing party when the losing party "had a full and fair opportunity to brief and present evidence").

1
2
### 5.    There is no genuine dispute that the defendants violated the FLSA's minimum-wage and overtime provisions.

3    Having determined that the defendants and NAB's workers were in an employer-

4   employee relationship that falls under the FLSA's purview for 2018, 2019, and 2021, I now

5   address whether the Secretary has shown beyond dispute that defendants violated the FLSA's

6   minimum-wage provision (as alleged in her first claim for relief) and overtime provision (as

7   alleged in her second claim for relief).  The record leaves no genuine dispute that the defendants

8   did violate the FLSA's wage-and-hour provision for each category of worker that NAB

9   employed.  By failing to respond to requests for admission, the defendants admit that NAB's

10  hourly front-desk employees occasionally worked more than 40 hours in a week without

11  receiving overtime pay.[183]  Their admission has not been meaningfully contested, so I conclude

12  that the defendants violated the FLSA's overtime provisions as to those employees.

13    The Secretary has also presented undisputed evidence that NAB's salaried salon assistant

14  Aurora Perez was not paid overtime for hours she worked beyond 40 hours per week.  The

15  defendants admit that Perez worked five days a week, and Brown testified that Perez worked

16  from 8:00 a.m. to 6:00 p.m.[184]  Perez was paid a flat rate regardless of how many hours she

17  worked in any given week.[185]  By failing to respond to requests for admission, Brown and Trinh

18  admit that Perez occasionally worked more than 40 hours a week and wasn't paid overtime for

19  those additional hours.[186]  So the Secretary has established overtime violations for Aurora Perez.

20

21  [183] ECF No. 119-3 at 12–13.

    [184] ECF No. 119-9 at 5:17–6:3.

22  [185] ECF No. 119-3 at 14–15; ECF No. 119-4 at 6; ECF No. 119-9 at 5:7–16.

23  [186] ECF No. 119-3 at 15.  Brown appears to argue that Perez should be excluded from FLSA coverage because she was a "manager" or an "exempt employee."  *See* ECF No. 133 at 24; ECF No. 113 at 7 n.1.  The FLSA provides several exemptions from its minimum-wage and overtime

The same is true for NAB's other salaried employee, eyelash tech Sierra Hudson. Hudson negotiated a salary with NAB that differed from the rest of the techs. She avers that, although she was working 50 hours a week at NAB, she wasn't making "enough money" and told Brown that she needed to get a second job.[187]  To prevent that, NAB and Hudson entered into a contract that "required [Hudson] to work 50 hours per week"—if she did, she would receive $800.[188]  If Hudson would have received more than $800 in commissions for any given week, she would also be paid that additional amount.[189]  Cleaning fees and "other fees" were deducted from that flat rate, and Hudson was expected to perform other tasks in addition to eyelash services while she was at the salon, like organizing products and helping with advertising.[190]  NAB's overtime violation is memorialized in its contract with Hudson, which required her to work 10 hours more than the statutory maximum without being paid a premium for those extra hours. And the Secretary provides calculations showing that Hudson's pay did not always shake out to be at least $7.25 per hour, thus violating the Act's minimum-wage provision.[191]

---

requirements, *see* 29 U.S.C. § 213, but Brown fails to explain which exemption should apply to Perez and she doesn't cite any competent evidence suggesting that Perez performed a managerial role at NAB. I credit Trinh's testimony describing Perez as a "salon assistant" who was primarily responsible for cleaning the salon, ECF No. 119-1 at 11:9–15, and the defendants' admissions that Perez was paid a salary to "perform cleaning duties at NAB." ECF No. 119-3 at 14. Brown, as one of Perez's employers, "has the burden of showing that [a claimed] exemption applies." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124 (9th Cir. 2002) (cleaned up). She has not met that burden, so I conclude that Perez is not exempt from the FLSA's minimum-wage and overtime requirements.

[187] ECF No. 118-24 at 3, ¶ 12.

[188] *Id.*

[189] *Id.*

[190] *Id.*; ECF No. 119-8 (Hudson's contract).

[191] ECF Nos. 117-1, 117-2.

The Secretary has met its burden to show that NAB violated overtime and minimum-wage provisions for its nail and eyelash technicians, too. Several techs averred that they worked more than 40 hours per week while employed at NAB.[192] And, by failing to respond to requests for admission, the defendants admit that their techs occasionally worked over 40 hours but were not paid at least 1.5 times their regular rate of pay for those extra hours.[193] The Secretary also provides calculations showing that four techs were not paid the minimum wage because their commissions, divided by the hours they worked and subtracting various fees NAB regularly imposed, resulted in an hourly wage less than $7.25 per hour.[194]

Brown contends that none of the techs worked more than 40 hours per week and that their commissions pencil out to a wage much higher than the FLSA's $7.25 minimum. But Brown's assertions rest on the incorrect assumption that the techs were only "working" when they were physically assisting customers. The evidence shows that Brown and Trinh required the techs to come to the salon and essentially be on call for long shifts waiting for walk-in customers. The techs were not permitted to leave the salon and come back only when they had clients scheduled—instead, they were required to stay on the premises. Those hours in which NAB's employees were required to be on site, even if they weren't actively serving customers, are considered working hours that require compensation.[195] And because of prior discovery abuses, the court has determined that Brown may not challenge the Secretary's calculation of the

---

[192] ECF No. 118-8 at 5, ¶ 20; ECF No. 118-24 at 3, ¶ 12; ECF No. 118-25 at 3, ¶¶ 10–11.

[193] ECF No. 119-3 at 14.

[194] *See* ECF Nos. 117-1, 117-2.

[195] *Cadena v. Customer Connexx LLC*, 51 F.4th 831, 836 (9th Cir. 2022) (noting that "the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty[,] or at a prescribed workplace" (cleaned up)); 29 C.F.R. § 778.223(a)(1) (same).

1    employees' hours.  So I find that there is no genuine dispute that the defendants have violated the

2    FLSA's overtime and minimum-wage provisions as to NAB's nail and eyelash techs.

3

4    ### 6.    *The coverage period goes back three years because Brown and Trinh's violations were willful.*

5            Having found that the defendants violated the FLSA's wage-and-hour requirements, the

6    next question is which statute of limitations applies. The Secretary argues that the longer of the

7    two potential statutes of limitation for these claims applies and permits her to pursue violations

8    that occurred within the three years before the Department filed this lawsuit.[196]  The defendants

9    don't meaningfully respond to this argument.

10           The FLSA contains a two-year statute of limitations for "any cause of action for unpaid

11   minimum wages, unpaid overtime compensation, or liquidated damages."[197]  But that time

12   period is expanded to three years if the cause of action "aris[es] out of a willful violation."[198]  A

13   violation is willful if "the employer either knew or showed reckless disregard for the matter of

14   whether its conduct was prohibited by the statute . . . ."[199]  The FLSA's regulations counsel that

15   "[a]ll of the facts and circumstances surrounding the violation [must] be taken into account in

16   determining whether a violation was willful."[200]  The regulations further explain that reckless

17   disregard "means, among other situations, that the employer should have inquired further into

18   whether its conduct was in compliance with the [FLSA] and failed to make adequate further

19

20

---

21   [196] ECF No. 108 at 36–37.

     [197] 29 U.S.C. § 255(a).

22   [198] *Id.*

23   [199] *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

     [200] 29 C.F.R. § 578.3(c)(1).

1    inquiry."[201]  And the Ninth Circuit has said that "[a]n employer's violation of the FLSA is

2    'willful' when it is on notice of its FLSA requirements, yet takes no affirmative action to assure

3    compliance with them."[202]  "[A]ttempts to evade compliance" or "minimize the actions

4    necessary to achieve compliance" are evidence of a willful violation.[203]

5         The Secretary has presented evidence sufficient to show that Trinh and Brown were

6    aware of the FLSA's requirements and attempted to evade them.  Soon after the Department

7    began its investigation of NAB, Brown and Trinh undertook a concerted effort to create records

8    that would support their theory that the techs were properly classified as independent contractors,

9    not NAB employees, and thus not subject to the FLSA's protections.  Brown sent a series of text

10   messages to approximately 25 of the techs, coaching them on what to say if they were

11   interviewed by the investigator and suggesting that the techs should provide information they

12   knew was not true when applied to them.[204]  For example, Brown instructed the techs to say that

13   they set their own hours and to report only time spent actually serving customers as the hours

14   they worked for any given day—as she put it, "you DO NOT want to say 'I work 3pm–close 6

15   days a week' because you're not actually working the entire time."[205]  "Waiting for appointments

16   or clients," she maintained, "is not considered working hours . . . ."[206]  Brown informed at least

17   one tech that she had "put microphones inside the room where the investigators [were]

18

19

20   [201] 29 C.F.R. § 578.3(c)(3).

21   [202] *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (cleaned up).

     [203] *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003).

22   [204] ECF No. 118-11 at 5, ¶ 21.

23   [205] ECF No. 118-12 at 6 (cleaned up).

     [206] *Id.* at 7 (cleaned up).

1  interviewing salon workers so she could hear everything that was being said to the

2  investigator[s]."[207]

3        In August 2019, Brown and Trinh held a meeting with the techs, during which Brown

4  "told [them] what to say and what not to say if the Department of Labor came to talk to

5  [them]."[208]  One tech reported that, after the investigation began, Brown started adding notes to

6  the MindBody schedules, falsely suggesting that techs were "out of building" running errands

7  when they were really at the salon but didn't have clients.[209]  It was around that same time that

8  Brown stopped paying techs via direct deposit and instead started paying them in cash.[210]

9        Several techs averred that, during this time, Brown and Trinh told every tech to get an

10  employee-identification number and a business license.[211]  They also made techs sign an

11  independent-contractor agreement—according to two techs, Brown had set up an iPad with the

12  contract on it, and the techs waited in line for their turn to sign.[212]  Others were asked to sign the

13  contract via email.[213]  One tech noted that, after she signed the contract, Brown "backdated [it] to

14  reflect a date of January [] 2019 instead of August 8, 2019."[214]  The Department's counsel also

15  _____

16  [207] ECF No. 118-25 at 6, ¶ 29.  Brown appears to corroborate that statement.  She attaches what
    she calls "transcripts" of recorded interviews involving the Department's investigator and
17  various techs to her summary-judgment response.  ECF No. 133-11.  Those documents are
    unauthenticated and have no indicia of reliability, so I do not consider their contents.  I reference
18  them here only to the extent that they support the Secretary's conclusion that Brown
    surreptitiously recorded the investigation.

19  [208] ECF No. 118-2 at 6, ¶ 24.

    [209] ECF No. 118-21 at 3–4, ¶ 11.

20  [210] ECF No. 118-25 at 4, ¶ 17.

21  [211] ECF No. 118-2 at 6–7, ¶ 25; ECF No. 118-8 at 5, ¶ 18; ECF No. 118-11 at 5, ¶ 20; ECF No.
    118-21 at 3, ¶ 10; ECF No. 118-24 at 4, ¶ 14; ECF No. 118-25 at 6, ¶ 29.

22  [212] ECF No. 118-2 at 7, ¶ 26; ECF No. 118-8 at 5, ¶ 19; ECF No. 118-21 at 3, ¶ 10.

23  [213] ECF No. 118-24 at 4, ¶ 15; ECF No. 118-25 at 6, ¶ 29.

    [214] ECF No. 118-11 at 5, ¶ 19.

1  attached a version of the contract signed by another tech that was created on August 8, 2019, but

2  backdated to May 20, 2019.[215]

3          In sum, this undisputed evidence shows that, instead of truly seeking compliance with the

4  FLSA, Brown and Trinh attempted to mislead the Department's investigators and their own

5  employees about how NAB and its techs operated.  I find that these facts establish without

6  genuine dispute that NAB willfully violated the FLSA, so the three-year limitations period

7  applies, encompassing any alleged violations beginning on May 21, 2018.[216]

8          **7.    *The Secretary has shown that some of NAB's employees are entitled to damages***
           ***for NAB's wage-and-hour violations, but further calculations are needed to***
9          ***ensure an accurate damages award.***

10         The Secretary argues that the defendants owe 46 employees $415,189.19 in minimum

11  wages and overtime pay.[217]  Based on the declarations submitted by NAB's employees and

12  because Brown didn't provide records reflecting her employees' hours, Wage and Hour

13  Investigator David Gonzalez "used a base estimate that workers worked 59.8125 hours in a

14  standard week[,] which [he] rounded up to 60 hours."[218]  Gonzalez then used the sparse available

15  records of each techs' commissions to "calculate[] an average weekly rate of pay by using the

16  total pay from contractor payments divided by the total number of workweeks reflected on the

17

18

---

19  [215] ECF No. 119-11 (contract); ECF No. 119-1 at 3, ¶ 12 (counsel decl. explaining dates found in
20  the document's metadata).

    [216] *See* ECF No. 1 (complaint, filed on May 21, 2021).

21  [217] *See* ECF No. 117-2.  The Secretary also argues that liquidated damages in the amount equal
    to these compensatory damages are owed to NAB's employees, resulting in an ultimate damages
22  award of $830,378.38.  ECF No. 108 at 23, 37–38.  I withhold my ruling on liquidated damages
    until the Secretary files a renewed motion calculating compensatory damages owed consistent
23  with my ruling, so I do not address entitlement to liquidated damages in this order.

    [218] ECF No. 117-1 at 5, ¶ 15.

1  contractor payments for each individual" and further divided that total by the 60-hour estimate to

2  determine the techs' hourly wages.[219]

3         Brown only provided enough information to complete those calculations for 20

4  employees—for the remaining 25 employees that didn't have payroll records, Gonzalez used the

5  combined average rate of pay from the 20 employees and divided that by the estimated 60-hour

6  workweek to conclude that those remaining techs were paid $10.10 per hour.[220]  And as for

7  Aurora Perez, Gonzalez credited Brown's testimony suggesting that Perez worked about 48

8  hours a week to calculate the amount that Perez should have been paid in overtime for those

9  hours.[221]  Gonzalez attaches a spreadsheet explaining the totals due to each employee.[222]  The net

10 result is that five techs were not paid the minimum wage for some periods of their time,[223] and

11 all 46 employees experienced overtime violations.[224]

12        I find that the basis of the Secretary's calculation is reasonable.  And according to those

13 calculations, it's clear that four employees who worked at NAB in 2018 and 2019 are entitled to

14 compensation under the FLSA's overtime and minimum-wage provisions:

15    • Chrystal Armoogan, NAB nail and eyelash tech from August 25, 2018, through July 6,

16       2019, is owed $1.68 for minimum-wage violations and $10,847.51 in overtime pay;

17    • Natalya Camacho, NAB nail tech from April 7, 2018, through August 3, 2019, is owed

18       $9,244.20 in overtime pay;

19  _____

20 [219] *Id.* at 6, ¶ 17.

   [220] *Id.* at 6, ¶ 18.

21 [221] ECF No. 117-1 at 6–7, ¶ 19.

22 [222] ECF No. 117-2.

   [223] ECF No. 117-2 at 2–3 (calculating minimum-wage violations for Chrystal Armoogan, Steven
23 Bao, Danica Estes, Sierra Hudson, and Barbara Foster).

   [224] *Id.*

- Danica Estes, NAB nail tech from May 4, 2019, through November 30, 2019, is owed $6,197.00 for minimum-wage violations and $3,664.18 in overtime pay; and

- Sierra Hudson, employed from February 2, 2019, through September 28, 2019, is owed $560 for minimum-wage violations and $3,664.76 in overtime pay.[225]

These four techs' employment dates fall squarely within the time frame during which NAB and its employees were covered by the FLSA's wage-and-hour provisions. Most of the other employees' date ranges cross into 2020—a year that I have excluded from consideration. Aurora Perez's calculations enter 2022, another year I do not consider. And Kimberly Garrison's employment began in March 2018, which is outside of the applicable statute of limitations, and it appears that the Secretary's calculations for Garrison's overtime pay reach back to that excluded date.[226]

Because I do not consider any backpay calculations before May 21, 2018, or for the years 2020 and 2022, the damages calculations for the remaining employees are no longer reliable, and removing those periods of time from the calculations may result in fewer violations and a smaller damages award. So, though I conclude that the four employees who worked at NAB from 2018 to 2019 are entitled to the damages detailed *supra*, I deny summary judgment on damages without prejudice to the Secretary filing a renewed motion for judgment based on calculations that exclude any requested damages incurred before May 21, 2018, and during 2020 and 2022. I will also address the Secretary's request for liquidated damages in an amount equal to the backpay total at that time.

---

[225] *Id.*

[226] *See* 117-1 at 5, ¶ 13 (Gonzalez Decl., stating that "the back-wage calculation covers the time period from March 18, 2018, . . . until November 12, 2022").

**B.    There is no genuine dispute that the defendants violated the FLSA's recordkeeping provisions, so the Secretary is entitled to summary judgment on her third claim for relief.**

The FLSA requires employers to "make, keep, and preserve such records of the persons employed by [them] and of the wages, hours, and other conditions and practices of employment maintained by [them]."[227]  An employer's failure to comply with this requirement is unlawful.[228] There's no genuine dispute that Brown and Trinh did not keep adequate records of their employees' hours.[229]  They did not require techs to clock in or out for their shifts and kept only spotty records of the commissions that the techs earned.[230]  So the Secretary is entitled to judgment on her recordkeeping claim, and the defendants are enjoined from committing future violations of the FLSA's recordkeeping provisions.

**C.    The Secretary is entitled to summary judgment on her FLSA retaliation claim.**

The FLSA makes it "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding" under the FLSA.[231]  The Ninth Circuit hasn't explicitly stated the elements for an FLSA retaliation claim.  But other courts that have taken up the issue use largely the same standard that applies to Title VII retaliation claims: a plaintiff must prove that an employee "engaged in protected expression" and "suffered an adverse employment action," and "that a causal link existed between the protected expression and the adverse

---

[227] 29 U.S.C. § 211(c).

[228] *See* 29 U.S.C. § 215(5).

[229] ECF No. 119-3 at 11 (admitting through deemed-admitted requests for admission that the defendants "did not record the hours that beauty professionals spent at NAB, LLC, in between customer appointments during the relevant time period").

[230] ECF No. 119-2 at 25:20–26:7; *see generally* ECF No. 117-4 (master tech payout spreadsheet, manually filed with the court).

[231] 29 U.S.C. § 215(a)(3).

1  action."[232]  As with the rest of the FLSA, its anti-retaliation provision must be interpreted

2  broadly to effectuate the FLSA's remedial purpose.[233]

3

4  ### 1.    *NAB's employees engaged in protected activity by cooperating with the Department's investigation.*

5      The Secretary has sufficiently shown that the techs who cooperated with Department

6  investigators "engaged in protected expression" under the FLSA.  At least one circuit court has

7  recognized that "communicat[ing] with investigators from the Wage and Hour Division" is

8  "necessary to the effective assertion of employees' rights under the [FLSA], and thus entitled to

9  protection."[234]  The Ninth Circuit hasn't addressed this question, but it has instructed courts to

10 give "a broad construction to" the anti-retaliation provision "to ensure that employees are not

11 compelled to risk their jobs in order to assert their wage and hour rights . . . ."[235]  "The Supreme

12 Court has made clear that the key to interpreting the FLSA's anti-retaliation provision is the need

13 to prevent employees' fear of economic retaliation for voicing grievances about substandard

14 conditions."[236]  Certainly, retaliating against an employee because she cooperated with the

15 Department's investigation into FLSA violations would discourage employees from sharing

16 complaints with the investigators.  That's precisely the type of conduct that the FLSA's anti-

17 retaliation provision is meant to protect.

18

19

20  _____

21  [232] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012) (cleaned up).

    [233] *Lambert*, 180 F.3d at 1004.
22
    [234] *Brock v. Richardson*, 812 F.2d 121, 124 (3d Cir. 1987).

23  [235] *Lambert*, 180 F.3d at 1004.

    [236] *Id.* at 1003 (cleaned up).

### 2.    *NAB's employees suffered adverse employment actions.*

The Secretary argues that Brown and Trinh engaged in adverse actions against their employees when they "[told] techs what to say and what not to say to" the Department's investigators, "demand[ed that] they purchase business licenses they did not need or desire," required that they sign independent-contractor agreements that did not reflect their true working conditions, and "threaten[ed] legal process and tens of thousands of dollars in liquidated damages."[237]  Brown and Trinh do not meaningfully respond to these arguments.

In the parallel Title VII context, the Ninth Circuit has explained that courts must take "an expansive view of the types of actions that can be considered adverse employment actions."[238] Adverse actions are those that are "reasonably likely to deter employees from engaging in protected activity."[239]  Several courts have concluded that coercing employees to provide false testimony and declarations to the Department during an FLSA investigation can constitute an adverse action.[240]  The Sixth Circuit reasoned that forcing an employee to choose between signing an agreement that would constitute a significant change in employment terms or risking termination could be considered constructive discharge and constitute an adverse action.[241]

---

[237] ECF No. 108 at 35–36.

[238] *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).

[239] *Id.*; *see also Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) (defining an adverse action under Title VII as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"); *see also McBurnie v. City of Prescott*, 511 Fed. App'x 624, 625 (9th Cir. 2013) (unpublished) (adopting *Burlington*'s adverse-action definition to evaluate an FLSA retaliation claim).

[240] *See, e.g.*, *Scalia v. Sarene Servs., Inc.*, __ F. Supp. 3d __, 2024 WL 3424722, at *28 (E.D.N.Y. July 15, 2024); *Acosta v. Nuzon Corp.*, 2019 WL 1460622, at *3 (C.D. Cal. Feb. 19, 2019) ("Extracting coerced declarations from employees violate [the] FLSA's anti-retaliation provision because an employee . . . may be deterred from participating in an ongoing Department of Labor investigation . . . .").

[241] *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 532 (6th Cir. 2011) (unpublished).

      **a.**     ***Requiring techs to give false testimony, forcing them to sign independent-contractor agreements, and mandating that they acquire business licenses constitute adverse employment actions.***

The Secretary has presented undisputed evidence that, after the initial Department visit to the salon, Brown instructed her employees on what to say if they were interviewed by the investigator, suggesting that they provide information that the techs knew was not true when applied to them.[242] Brown also required all of the techs to get a business license to support NAB's independent-contractor story, telling them that the licenses were needed to prevent the Department from levying fines against NAB employees.[243]

Brown also made the techs sign an independent-contractor agreement that contained "basic guidelines," informing techs that they "make and set [their] own schedule[s]," must "purchase all [of their] own products to service the clients," will "determine and set [their] own prices to charge each client," will receive "a copy of their own key to access the facility any time they would like to service clients," and are entitled to "[t]ake work as needed or on a case-by-case basis."[244] None of those guidelines reflected the working realities of the techs employed at that time.[245] The contract also required techs to pay rent and a security deposit.[246] And it contains a non-compete clause prohibiting techs from performing services for any business within a ten-mile radius of NAB, a non-solicitation clause barring techs from attempting to provide non-NAB services to prior NAB customers, and a confidentiality provision.[247] None of those restrictions existed for techs who were already working at NAB. Two techs aver that

---

[242] ECF No. 118-11 at 5, ¶ 21; ECF No. 118-12.

[243] ECF No. 118-12 at 21.

[244] ECF No. 119-12 at 2.

[245] *See supra* at Discussion, § A.1.

[246] ECF No. 119-12 at 2.

[247] *Id.*

1    Brown told them that they could not come back to work if they didn't obtain a business license

2    or sign the contract.[248]  One tech declares that Brown told her she "would have to pay a fine to

3    the Department of Labor" if she didn't sign the agreement.[249]

4         There is no genuine dispute that Brown and Trinh's actions are adverse-employment

5    ones.  Requiring employees to give false testimony to Department investigators has the direct

6    effect of dissuading workers to speak honestly with investigators about any wage-and-hour

7    violations they experienced at NAB.  And requiring employees to sign agreements and obtain

8    licenses that reflect a significant change in the terms of their employment, or else face

9    termination, is equivalent to constructive discharge and thus also qualifies as adverse.

10

11   **b.    *Threatening legal action against Kimberly Garrison was an adverse employment action.***

12        The Secretary also contends that Brown and Trinh violated the FLSA's anti-retaliation

13   provision when they "attempted to muzzle workers who left NAB with cease-and-desist letters,

14   drafted by NAB's attorney ordering them to . . . stop speaking with third parties concerning the

15   nail salon" and "threaten[ing] workers who sought unpaid wages with tens of thousands of

16   dollars in liability . . . for allegedly breaching the non-compete clause of the fictitious

17   independent[-]contractor agreement . . . ."[250]  The Secretary cites only one declaration—that of

18   nail tech Kimberly Garrison—to support her factual contentions on this claim.  Garrison quit

19   NAB in September 2019 "because [she] did not like how [Brown] and [Trinh] were operating the

20   _____

21   [248] ECF No. 118-8 at 5, ¶¶ 18–19 (Estes Decl., averring that Brown told her to get a business license if she "wanted to continue to be a nail technician a[t] NAB" and required her to "sign something on her iPad" if she wanted to continue working there); ECF No. 118-11 at 5, ¶ 19

22   (Garrison Decl., averring that Brown "forced [her] into signing a contract" and "told [her] and the other techs that if [they] did not sign the contract, [they] could not come back to work").

23   [249] ECF No. 118-11 at 5, ¶ 19.

     [250] ECF No. 108 at 22.

business," primarily with respect to their handling of the Department's investigation.[251]  Garrison

avers that after she quit, Brown and Trinh "harassed" her and withheld her last paycheck.[252]

Garrison received a cease-and-desist letter from NAB's attorney, accusing her of defamation;

disparaging NAB's business; and violating the non-compete, non-solicitation, and confidentiality

provisions of the independent-contractor agreement she was told to sign in August 2019.[253]  The

letter claimed that Garrison was liable to NAB for $72,000 in liquidated damages.[254]  Garrison

told the Department's investigator about Brown and Trinh's actions, and only then did they

release Garrison's paycheck—though they "still withheld money from it."[255]

Though the Ninth Circuit has not clearly ruled on this issue, other circuits have

persuasively concluded that the FLSA's anti-retaliation provision protects employees who

voluntarily leave their employers.[256]  And withholding a former employee's final paycheck and

threatening litigation with a large monetary demand surely constitutes "economic retaliation"[257]

---

[251] ECF No. 118-11 at 5, ¶ 23.

[252] *Id.* at 6, ¶ 24.

[253] ECF No. 118-13.

[254] *Id.*

[255] ECF No. 118-11 at 6, ¶ 25.  Other techs complained of possible retaliation involving cease-and-desist letters.  *See* ECF No. 118-7 at 2, ¶ 3; ECF No. 119-19 (cease-and-desist letter sent to Chrystal Armoogan); ECF No. 118-3 at 6, ¶ 19; ECF No. 118-6 (cease-and-desist letter sent to Brittany Bennett).  But the Secretary does not mention those letters in the material facts she cites in support for her retaliation claim, *see* ECF No. 108 at 35–36 (citing "Section II.G." of the summary judgment motion, which cites only to Garrison's cease-and-desist letter), so I consider only the facts regarding threatened litigation against Garrison as support for this portion of the retaliation claim.

[256] *See Darveau v. Detecon, Inc.*, 515 F.3d 334, 341–43 (4th Cir. 2008) (noting that the Supreme Court interpreted a similar anti-retaliation provision in Title VII to apply to "former, as well as current employees" (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345–46 (1997)); *accord Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1406–08 (10th Cir. 1992); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 147 (6th Cir. 1977); *Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 306 (5th Cir. 1972).

[257] *Lambert*, 180 F.3d at 1003.

1  that "might have dissuaded a reasonable worker from making or supporting" an FLSA claim.[258]

2  So I find that the Secretary has established without genuine dispute that Garrison suffered an

3  adverse action when NAB threatened legal action against her and withheld her paycheck.

4

5  ### 3. There is no genuine dispute that the employees' cooperation with the Department's investigation caused the adverse employment actions.

6  There is no genuine dispute that the Department's investigation and the tech's agreements

7  to speak with the investigators caused Brown and Trinh to take these actions. But-for the

8  investigation, Brown and Trinh would not have attempted to coach the techs to provide false

9  testimony. Nor would Brown and Trinh have required the techs to sign independent-contractor

10  agreements or obtain business licenses at their own expense. Brown said as much in text

11  messages to the techs, telling them that some techs "[f]*cked up the interview" by failing to

12  answer questions in a manner that supported Brown's contention that they were independent

13  contractors and asking them to "memorize everything in" the independent-contractor agreement

14  they were required to sign, emphasizing that the terms in that agreement "are the rules we need

15  to play and follow."[259]

16  There is also no genuine dispute that NAB threatened legal action against Garrison

17  because of her willingness to participate in the Department's investigation. Retaliation "may be

18  inferred from proximity in time between the protected action and the allegedly retaliatory"

19  action.[260] Investigators spoke to techs for the first time in July 2019.[261] Garrison signed the

20  independent-contractor agreement that August and quit a month later because she was

21  [258] *Burlington*, 548 U.S. at 67 (noting that "[t]he scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm").

22  [259] ECF No. 118-12 at 17–18.

23  [260] *Ray*, 217 F.3d at 1244 (discussing causation for retaliation claims in the Title VII context).
    [261] ECF No. 117-1 at 2, ¶ 5.

1   dissatisfied with Brown and Trinh's handling of the Department's wage-and-hour investigation.

2   NAB sent her a cease-and-desist letter accusing her of violating the terms of that disingenuous

3   agreement within weeks. That NAB immediately used the terms of the independent-contractor

4   agreement (that Garrison was retaliatorily forced to sign in the first place) to threaten legal action

5   against Garrison strongly supports the singular inference that Garrison's participation in the

6   investigation was the motivating force behind the defendants' actions. And Brown and Trinh fail

7   to produce any evidence or provide any argument suggesting otherwise.

8          Because there is no genuine dispute that the employees engaged in protected conduct

9   when they spoke to investigators, that Brown and Trinh's actions constitute adverse actions, and

10  that NAB's employees suffered those actions because they were speaking with—or expected to

11  soon speak with—investigators, I grant the Secretary summary judgment on her retaliation claim

12  and enjoin the defendants from committing future violations of the FLSA's anti-retaliation

13  provision.

14  **D.    Brown's objection to the magistrate judge's attorney-withdrawal order is overruled.**

15         On October 3, 2024, attorney Paige Pulley moved to withdraw from this action,

16  explaining that she would no longer be working for the Department of Labor on November 1,

17  2024.[262] Magistrate Judge Youchah granted the motion the day it was filed.[263] Brown objects,

18  arguing that she wasn't permitted to file a response to the motion, depriving her "of the

19  opportunity to raise concerns about the attorney's misconduct."[264] A district judge may

20  reconsider any non-dispositive matter that has been finally determined by a magistrate judge

21  "when it has been shown that the magistrate judge's order is clearly erroneous or contrary to

22  _____

    [262] ECF No. 141.

23  [263] ECF No. 142.

    [264] ECF No. 143.

1  law."[265]  This standard of review "is significantly deferential" to the magistrate judge's

2  determination.[266]

3          Brown's argument is patently frivolous.  She is not entitled to respond to an attorney's

4  request to withdraw from representing an entity that the attorney no longer works for.  And

5  Brown may seek sanctions against the Department even if the at-issue attorney no longer

6  represents a party—an action that Brown indeed has taken.[267]  So I overrule Brown's objection to

7  the magistrate judge's order granting Pulley's withdrawal motion.

8  **E.      Brown's motion for sanctions is denied.**

9          Three days after Brown filed her objection, she filed a motion for sanctions against the

10  Department.[268]  It contains unsupported, frivolous accusations against various Department of

11  Labor investigators and attorneys who have been involved in this case.  Brown states that the

12  Department's former attorney "engaged in egregious and systematic misconduct throughout this

13  case," including forgery, tampering with evidence, falsification of declarations, and "abuse of the

14  government informant privilege."[269]  She insists that the "evidence of misconduct is clear, well-

15  documented, and compelling" [270] but provides no facts or documentation to support any of her

16  accusations.

17          Brown references exhibits filed with her untimely summary-judgment response that she

18  claims show wrongdoing, but those documents have no indicia of reliability.  Most of those

19  _____

20  [265] L.R. IB 3-1(a).

21  [266] *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for So. Cal.*, 508 U.S. 602, 623 (1993).

22  [267] *See* ECF No. 144.

     [268] *Id.*

23  [269] *Id.* at 2.

     [270] *Id.* at 10.

1  exhibits exclusively contain argument about the wrongs that Brown believes she has suffered in

2  this litigation, interspersed with unauthenticated screenshots of text messages and court filings.

3  Others purport to be "transcripts" of surreptitiously recorded interviews between Department

4  investigators and NAB techs but appear to be fabricated (and Brown has not given the

5  Department or the court the audio or video recordings of those interviews for review).[271]  I do not

6  consider any of those exhibits, and Brown's arguments alone do not suggest that the

7  Department's investigators or attorneys engaged in any wrongdoing while prosecuting this case.

8      Brown spends the rest of her sanctions motion complaining that the Department's

9  investigation has cost her hundreds of thousands of dollars in legal fees and countless hours of

10  her time.  She blames this litigation for the deterioration of her health, financial status, and

11  business prospects.  Even if true, none of this justifies sanctions against the Department or its

12  attorneys.  Brown has presented no competent evidence to show that the Department undertook

13  its investigation or initiated this lawsuit for vindictive or bad-faith reasons or with the intent to

14  financially harm Brown or her business.  Indeed, as explained *supra*, the Department has largely

15  met its burden to show that NAB, Brown, and Trinh misclassified their employees as

16  independent contractors and willfully violated the FLSA.  Litigation is often stressful and

17  expensive, but that alone is not a reason to sanction a plaintiff for pursuing meritorious claims.

18  So I deny Brown's motion for sanctions.

19                **Conclusion**[272]

20      IT IS THEREFORE ORDERED that the Secretary of Labor's motion for summary

21  judgment **[ECF No. 108] is GRANTED in part and DENIED in part:**

22  [271] *See, e.g.*, ECF Nos. 133-9 (accusing a nail tech of employment fraud in Texas); 133-11 (partial "transcripts" of elicit recordings).

23  [272] Should any grant of summary judgment against NAB more properly be an entry of default judgment, it should be deemed so.

- I grant the Secretary summary judgment against Brown and Trinh, and default judgment against NAB, LLC, on her retaliation and recordkeeping claims. **The defendants are hereby enjoined from committing future violations of the FLSA's recordkeeping provisions** (29 U.S.C. §§ 211(c) & 215(a)(5)) **and anti-retaliation provision** (29 U.S.C. § 215(a)(3)).

- The Secretary has established that NAB's employees are covered by the FLSA's wage-and-hour provisions **from May 21, 2018, through December 31, 2019, and January 1, 2021, through December 31, 2021.** The Secretary has also established that the defendants violated the FLSA's wage-and-hour provisions during that time frame, so **I grant summary judgment for the Secretary and against Brown and Trinh, and default judgment against NAB, LLC, on her minimum-wage and overtime claims for those time periods as to liability only. I deny the Secretary's summary judgment motion as to those claims for the years 2020 and 2022.**

- Because this narrowed timeframe complicates any damages calculations for the defendants' wage-and-hour violations, **I deny the Secretary summary judgment on damages for the minimum-wage and overtime violations without prejudice to the Secretary's filing of a renewed motion with calculations that exclude any damages stemming from alleged violations that occurred in 2020 and 2022**. The Secretary's new damages calculation must include the damages owed to all employees for the years 2018, 2019, and 2021, including the four employees that are entitled to damages as discussed in this order. The court will determine whether liquidated damages apply at that time. The Secretary must also renew her request for injunctive relief related to her wage-and-hour claims and include any proposed language that such an injunction should

1   contain. **That motion must be filed by February 3, 2025. Brown and Trinh will**

2   **have until February 17, 2025, to respond. The Secretary will have until February**

3   **24, 2025, to reply.**

4   IT IS FURTHER ORDERED that Brown's motion for summary judgment **[ECF No. 97] is**

5   **GRANTED in Part and Denied in Part.** It is granted only as to the Secretary's wage-and-

6   overtime claims for 2020 and 2022. It is DENIED in all other respects.

7   IT IS FURTHER ORDERED that Brown's motion to dismiss **[ECF No. 98] is DENIED.**

8   IT IS FURTHER ORDERED that Brown's objection to the magistrate judge's order

9   withdrawing counsel **[ECF No. 143] is OVERRULED.**

10  IT IS FURTHER ORDERED that Brown's motion for sanctions **[ECF No. 144] is DENIED.**

11  IT IS FURTHER ORDERED that the Secretary's motion to strike **[ECF No. 136] is**

12  **DENIED.**

13  IT IS FURTHER ORDERED that **the Clerk of Court is directed to STRIKE ECF Nos**.

14  **139 and 140** because those filings do not comply with the rules of this court.

15  IT IS FURTHER ORDERED that the **Clerk of Court is instructed not to enter judgment**

16  **in this case at this time**. Final judgment will be ordered following the Secretary's additional

17  showing of proof.

18

19  _____

20  U.S. District Judge Jennifer A. Dorsey
    January 14, 2025

21

22

23